2014-1575, -1576

# United States Court of Appeals
# for the Federal Circuit

BELDEN INC.,

*Appellant,*

v.

BERK-TEK LLC,

*Cross-Appellant.*

*Appeals from the United States Patent and Trademark Office*
*Patent Trial and Appeal Board in No. IPR2013-00057*

## BRIEF OF APPELLANT BELDEN INC.

MATTHEW B. LOWRIE
AARON W. MOORE
MATTHEW A. AMBROS
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
P: (617) 342-4000
F: (617) 342-4001

*Attorneys for Appellant Belden Inc.*

September 25, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Belden Inc. certifies the following:

1.    The full name of every party or amicus represented by me is Belden Inc.

2.    The name of the real party in interest is Belden Inc.

3.    No parent corporation or any publicly held company owns 10 percent of more of the stock of Belden Inc.

4.    The names of all law firms and the partners and associates that have appeared for Belden Inc. before the United States Patent and Trademark Office or are expected appear in this Court are:  Foley & Lardner LLP attorneys Matthew B. Lowrie, Aaron W. Moore, and Matthew A. Ambros.

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF RELATED CASES ................................................. ix

I.    STATEMENT OF JURISDICTION .................................................1

II.   STATEMENT OF THE ISSUES ....................................................1

III.  STATEMENT OF THE CASE ......................................................2

    A.    Procedural History..............................................................3

    B.    Preliminary Statement Regarding the Inter Partes Review
        Procedure...........................................................................6

IV.   STATEMENT OF FACTS ...........................................................7

    A.    The Claimed Invention.......................................................7

    B.    The Inter Partes Review of the '503 Patent .........................10

        1.    Berk-Tek's Petition Relied Solely on Attorney
            Argument, Not Evidence ..........................................10

        2.    The Board Instituted Inter Partes Review Based on the
            Petition's Attorney Argument...................................13

        3.    Belden's Response Was Supported by the Testimony of a
            Person of Ordinary Skill in the Art...........................14

            a.    JP '910 Concerns a Method of Manufacturing an
                Alternative to a Twisted "Quad," Not a Data
                Communications Cable...................................15

        b.    The Petition and the Board's Decision Instituting IPR Misconstrued JP '910's "Above All" Passage ........17

        c.    A Person of Ordinary Skill in the Art Would Not Have Been Motivated to Control Twisting in JP '910 Using a First Die as in the '503 Patent..................18

        d.    A Person of Ordinary Skill in the Art Would Not Have Been Motivated to Control Twisting in JP '910 Using a Third Die the '503 Patent..........................20

    4.    Berk-Tek's Reply Disclosed Newly Submitted Expert Testimony.................................................................21

        a.    Berk-Tek's New Arguments for Ground 2.....................22

        b.    Berk-Tek's New Arguments for Ground 3.....................25

    5.    Belden Asked That Berk-Tek's Reply Be Disregarded, but Berk-Tek Was Authorized to File a "Revised" Reply........26

    6.    Belden's Motion to Exclude Berk-Tek's Improper Reply Evidence....................................................................27

    7.    The Board's Final Written Decision Relied Only on the Analysis of Berk-Tek's Belatedly Disclosed Expert Declaration ............................................................29

V.     SUMMARY OF THE ARGUMENT ............................................30

VI.    ARGUMENT........................................................................32

    A.    STANDARD OF REVIEW ................................................32

    B.    THE BOARD ERRED IN HOLDING CLAIMS 1 AND 4 OF THE '503 PATENT OBVIOUS UNDER § 103.................33

    1.    The Board's Finding of a Motivation to Combine Was Not Supported by Substantial Evidence ....................33

        a.    JP '910 Teaches Making Transmission Lines, Not Cables ..........................................................34

iii

b.     It Would Not Have Been Possible To Control Twisting Of The "Thread-Like Object" Using The "Hole" In The First Die. ...................................37

c.     Any Attempt to Control Twist Would Have Deformed the "Thread-Like" Object ...............................38

d.     JP '910 Would Not Be Modified Because It Already Had a Mechanism for Placing The Conductors Into the Grooves ...........................................41

C.     THE BOARD ERRED IN HOLDING CLAIMS 2 AND 3 OF THE '503 PATENT OBVIOUS UNDER § 103 .................................42

D.     THE BOARD'S FINAL WRITTEN DECISION IMPROPERLY RELIED ON NEW EVIDENCE ..............................46

E.     THE BOARD ERRED IN DENYING BELDEN'S MOTION TO EXCLUDE EXPERT TESTIMONY UNDISCLOSED UNTIL BERK-TEK FILED ITS REPLY ...........................................49

1.     The Board Rules Require It To Disregard Improper Replies in Their Entirety ...........................................49

2.     The Board Improperly Failed to Exclude and Disregard the Baxter Declaration ...............................................51

a.     The Baxter Declaration Was Necessary for Berk-Tek's Prima Facie Case ...................................................51

b.     The Board Failed to Follow Its Own Rules That Prohibited it from Parsing Declaration...........................56

VII.     CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................61

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

iv

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ...........................................................................42

*Align Tech., Inc. v. ITC*,
   2014 U.S. App. LEXIS 13717 (Fed. Cir. Jul. 18, 2014) ......................................49

*Amoco Oil Co. v. United States*,
   234 F.3d 1374 (Fed. Cir. 2000) ...........................................................................50

*AMS Assocs. v. U.S.*,
   737 F.3d 1338 (Fed. Cir. 2013) ...........................................................................32

*BAE Sys. Information & Electronic Sys. Integration, Inc.
   v. Cheetah Omni, LLC*, IPR2013-00175 (PTAB Jun. 19, 2014) ..........................52

*Belden Technologies, Inc. and Belden CDT (Canada) Inc.
   v. Superior Essex Inc. and Superior Essex Communications LP*,
   Case No. 08-cv-063-SLR (D. Del.) .........................................................................9

*Blackberry Corp. v. Mobilemedia Ideas, LLC*,
   IPR2013-00036 (PTAB Jul. 26, 2013) ..................................................................51

*Bowles v. Seminole Rock & Sand Co.*,
   325 U.S. 410 (1945) .............................................................................................32

*Carbino v. West*,
   168 F.3d 32 (Fed. Cir. 1999) ...............................................................................50

*CBS Interactive Inc. v. Helferich Patent Licensing, LLC*,
   IPR2013-00033 (PTAB Oct. 23, 2013) .................................................................23

*Cheese Sys. v. Tetra Pak Cheese & Powder Sys.*,
   725 F.3d 1341 (Fed. Cir. 2013) .................................................................... 40, 45

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938) .............................................................................................32

v

*Corning Inc. v. DSM IP Assets B.V.*,
    IPR2013-00047 (PTAB May 1, 2014) ................................................60

*Ford Stewart Sch. v. Fed. Labor Relations Auth.*,
    495 U.S. 641 (1990) .........................................................................49

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) .............................................................................45

*Harmonic, Inc. v. Avid Tech., Inc.*,
    IPR2013-00252 (PTAB Jul. 10, 2014) .............................................56

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) .......................................................32

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) ................................................ 42, 46

*In re NTP, Inc.*,
    654 F.3d 1268 (Fed. Cir. 2011) .......................................................32

*In re Stepan Co.*,
    660 F.3d 1341 (Fed. Cir. 2011) .......................................................49

*In re Zurko*,
    258 F.3d 1369 (Fed. Cir. 2001) .......................................................52

*Institute Pasteur v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) .......................................................48

*KS HIMPP*,
    110 U.S.P.Q.2D (BNA) ...................................................................52

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ................................................................ 44, 45

*Nexans Inc. v. Belden Inc., et al.*,
    No. 12-cv-1491 (D. Del.) ................................................................ viii

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013) ........................................... 46, 49, 59

*Shaw Indus. Group, Inc. v. Automated Creel Sys., Inc.*,
    IPR2013-000132 (PTAB Jul. 24, 2014) ............................................................56

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ............................................................50

*St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*,
    749 F.3d 1373 (Fed. Cir. 2014) ............................................................48

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) ............................................................32

*The Scotts Co. LLC v. Encap, LLC*,
    IPR2013-00110 (PTAB Jun. 24, 2014) ........................................ 57, 59

## Statutes

28 U.S.C. § 1295(a)(4)(A) ........................................................................1

35 U.S.C. § 6 ...........................................................................................1

35 U.S.C. § 102 ............................................................................ 3, 8, 46

35 U.S.C. § 103 ........................................................ 3, 32, 33, 42, 46

35 U.S.C. § 103(a) .............................................................................1, 2

35 U.S.C. § 316(e) ................................................................................32

35 U.S.C. § 329 ......................................................................................1

## Rules and Regulations

37 C.F.R. § 42.2 ...................................................................................46

37 C.F.R. § 42.22(a)..............................................................................50

37 C.F.R. § 42.23(b) ...................................................................... 27, 50

vii

37 C.F.R. § 42.62(a) ................................................................................59

37 C.F.R. § 42.100(a) ..............................................................................46

37 C.F.R. § 42.104(b) ..............................................................................46

37 C.F.R. § 90.3(a)(1) ................................................................................1

Fed. Cir. R. 47.5(a) ................................................................................ viii

Fed. Cir. R. 47.5(b) ................................................................................ viii

## Other Authorities

*Office Patent Trial Practice Guide*,
   77 Fed. Reg. 48756 (Aug. 14, 2012) ........................................... 28, 50, 56, 57, 58

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), Appellant Belden Inc. ("Belden") certifies that there is no other appeal in this proceeding from the United States Patent and Trademark Office that was previously before this Court or any other appellate court.

Cross-Appellant Berk-Tek LLC ("Berk-Tek") filed a cross-appeal in this Court (Appeal No. 14-1576) to which this appeal is the lead appeal.

Pursuant to Fed. Cir. R. 47.5(b), the Court's decision in this appeal may affect *Nexans Inc. v. Belden Inc., et al.*, No. 12-cv-1491 (D. Del.), a district court action in which the involved U.S. Patent No. 6,074,503 is asserted.  The district court action has been stayed pending the outcome of the present appeal.  (*See* Jun. 19, 2014 Order Re. D.I. 85.)

# I.   STATEMENT OF JURISDICTION

The United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board (the "Board") had jurisdiction over Berk-Tek's Petition pursuant to 35 U.S.C. § 6.

On March 18, 2014, the Board issued its Final Written Decision.  (Doc. 1-4, p. 5; A51.)  On May 16, 2014, in compliance with 37 C.F. R. § 90.3(a)(1), Belden timely filed its Notice of Appeal.  (Doc. 1-2; A51.)

On May 20, 2014, Berk-Tek filed a Notice of Appeal, which was docketed at Appeal No. 14-1576 and associated with the present lead appeal.  (Doc. 2.)

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

# II.   STATEMENT OF THE ISSUES

1.     Whether the Board erred in finding that claims 1 and 4 of U.S. Patent No. 6,074,503 (the "'503 Patent") are unpatentable under 35 U.S.C. § 103(a) as obvious over Japanese Sho57(1982)-1991 ("JP '910"), where the cited portion of the reference does not concern the manufacture of a "cable," as claimed, and fails to teach the step of preventing twisting of the core, and where the only reason for modifying the reference that was identified in the Petition was admitted to be faulty, the replacement reasons to combine were improperly offered in reply and,

in any event, and the replacement reasons are not supported by substantial evidence.

2.      Whether the Board erred in finding that claims 2 and 3 of the '503 Patent are unpatentable under 35 U.S.C. § 103(a) as obvious over (i) JP '910 and U.S. Patent No. 4,393,582 (the "'582 Patent"), and (ii) JP '910 and Japanese S52(1977)-76694 ("JP '694"), where, again, the cited portion of the primary reference does not concern manufacture of a cable or prevent twisting, and the Board's reasons for modifying were omitted from the Petition, were offered too late, and are also unsound.

3.      Whether the Board erred in denying Belden's Motion to Exclude, which sought to exclude evidence, including a voluminous expert declaration with nineteen new exhibits, that Berk-Tek submitted with its Reply in plain violation of the Board's own Rules, depriving Belden of a meaningful opportunity to respond.

## III.    STATEMENT OF THE CASE

This appeal arises from an *inter partes* review ("IPR") instituted by the Board under the Leahy-Smith America Invents Act (the "AIA").  Belden, the petitioner in this appeal, is the owner of the '503 Patent, the subject of the IPR.

As shown herein, the Board erred in its legal conclusions and performed fact finding that lacks the support of substantial evidence.  In addition, the Board failed to follow its own rules, which explicitly prevent IPR petitioners, like Berk-Tek,

2

from plugging the holes in their Petitions with new evidence and new argument in *reply*, which (under the Board's rules) deprives the patent owner of a fair opportunity to respond.

### A.    Procedural History

On November 19, 2012, Berk-Tek filed its Petition for IPR of Belden's '503 Patent.  (A50.)  On November 28, 2012, Berk-Tek filed a Revised Petition to correct certain informalities.  (*See* A109-A111; A50.)

On February 28, 2013, Belden filed its Preliminary Response, identifying numerous deficiencies in Berk-Tek's Petition, including Berk-Tek's exclusive reliance on attorney argument rather than evidence.  (A368-A402 at A377-A378; A50.)  Belden explained that the crux of Berk-Tek's Petition was attorney argument that combinations and modifications of the prior art were appropriate solely as matters of "design choice," which is insufficient to establish *prima facie* obviousness under 35 U.S.C. § 103.  (A368-A402 at A396-A399.)

On April 16, 2013, the Board issued its Decision Instituting IPR on four grounds:  (1) proposed rejection of claims 1 and 2 under 35 U.S.C. § 102 as anticipated by the '582 Patent; (2) proposed rejection of claims 1 and 4 under 35 U.S.C. § 103 as obvious in light of JP '910; (3) proposed rejection of claims 2 and 3 under 35 U.S.C. § 103 as obvious over JP '910 and either the '582 Patent or JP '694; and (4) proposed rejection of claims 5 and 6 under 35 U.S.C. § 103 over JP

3

'910 and Canadian Patent No. 2,058,046 ("CA '046"). (A415-A457 at A456; A50.)

On April 30, 2013, Belden and Berk-Tek each filed Requests for Rehearing of the Board's Decision. (A50.) In its Request, Belden explained that Grounds 2-4 were based on a misreading of a specific portion of JP '910 that discussed "shortcomings" of the prior art that the inventor of the JP '910 purported to resolve, not aspects of JP '910's method itself. (A500-A501; A415-A457 at A444-A445.)

On May 14, 2013, the Board denied Berk-Tek's Request for Rehearing. (A50.) On May 15, 2013, the Board denied Belden's Request for Rehearing, stating that "Belden believes that certain specific disclosure of JP '910, which was relied on by the Board in the Decision, would not have reasonably suggested preventing twisting of the core" and that "[t]hat contention can be made by Belden in its Patent Owner Response." (A526; A50.)

On June 24, 2013, Belden filed its Response to the Petition, identifying the deficiencies in the Grounds on which the Board instituted IPR, with the support of an expert declaration from the '503 Patent's inventor, William Clark. (A546-A587; A50.)

On August 26, 2013, Berk-Tek filed its Reply and submitted a new sixty-page declaration from Mr. Leslie Baxter, to which he attached nineteen new

4

exhibits.  (A50.)  Although Mr. Baxter had been hired by Berk-Tek much earlier, the sixty-page reply declaration was his first submission.

On September 9, 2013, a conference call with the parties and the Board was held to discuss Berk-Tek's Reply, which Belden believed to be improper due to Berk-Tek's newly submitted expert declaration.  (A874-A878 at A874.)  Following the conference call, the Board ordered that Belden would be allowed to cross-examine Mr. Baxter, and that Berk-Tek would be permitted to file "a Revised Reply which only removes arguments [*i.e.*, adds no new arguments] and which relies on less of the reply declaration currently of record."  (A874-A878  at A876-A877.)

On September 12, 2013, Berk-Tek filed its Revised Reply, asserting that its entire original Reply was proper, but admitting that "this revised Reply omits citations to the Baxter Declaration referring to claim construction, and to the '503 file wrapper . . . [and that] this revised Reply omits further citations to the Baxter Declaration and cites directly to certain attached Appendices."  (A884; A50.)

On October 17, 2013, Belden filed its Motion to Exclude Evidence, seeking to exclude, among other things, Berk-Tek's belatedly filed Baxter Declaration and its nineteen accompanying exhibits.  (A922-A943; A50.)  On October 17, 2013, Belden also filed Observations on the Cross-Examination of Berk-Tek's reply declarant, Mr. Baxter.  (A912-A921; A50.)

On October 31, 2013, Berk-Tek filed its Response to Belden's Motion to Exclude Evidence and a Response to Belden's Observations on the Cross-Examination of Baxter.  (A450.)  Belden filed its Motion to Exclude Reply on November 7, 2013.  (A1261-A1272; A50.)

The Board conducted the trial of this matter on November 20, 2013, and issued its Final Written Decision on March 18, 2014.  (A1363; A1-A48.)  As to Ground 1, the Board held that claims 1 and 2 of the '503 Patent were not anticipated by the '582 Patent.  (A1-A48 at A47.)  As to Ground 2, the Board found claims 1 and 4 to be unpatentable as obvious over JP '910 alone.  (*Id.*)  As to Ground 3, the Board found claims 2 and 3 to be unpatentable as obvious over JP '910 in combination with the '582 Patent or CA '046.  (*Id.*)  As to Ground 4, the Board found that claims 5 and 6 were *not* obvious over JP '910 and CA '046.  (*Id.*)  The Board also denied Belden's Motion to Exclude.  (*Id.*)

On May 16, 2014, Belden timely filed its Notice of Appeal, seeking review of the Board's invalidity rulings involving JP '910 and its denial of Belden's Motion to Exclude.  (Doc. 1; A51.)

## B.    Preliminary Statement Regarding the *Inter Partes* Review Procedure

In addition to the legal and factual errors that Belden seeks to remedy on appeal, this case represents an opportunity to provide guidance to the Board concerning the sound administration of IPR proceedings.  Pursuant to statutory

deadlines for the resolution of IPR proceedings, the Board has adopted rules strictly controlling the disclosure of evidence and argument.

Those rules do not allow a patent owner—here, Belden—an opportunity to respond to arguments presented in a petitioner's reply.  For that reason, it is necessary that Petitioners produce ***all evidence and argument*** in their Petitions, so that patent owners are afforded a fair opportunity to respond with evidence and written submissions.

Simple fairness dictates that an IPR petitioner should be held to the Board's Rules and prohibited from sandbagging the patent owner with new evidence, including, in particular, testimony from a previously undisclosed expert introduced in a reply.  As discussed further below, the Board's failure to enforce its own Rules in this instance improperly and unfairly prejudiced Belden.

## IV.    STATEMENT OF FACTS

### A.    The Claimed Invention

The '503 Patent claims a method for producing "high-speed data communications cable."  ('503 Patent, A52-A61.)  Such cables are constructed to meet exacting requirements for performance and safety.  Any changes to the physical dimensions and properties, or the components of the cable, can have unexpected effects on cable performance, even in the case of small design

7

alterations.  And any change in one facet of the design impacts every other aspect.

(A977-A978 at 102:21-105:6.)

In the claimed method, (A) a first die both aligns a transmission media with "surface features" of a "core" and "prevents twisting motion of the core," (B) a second die bunches the transmission media and the core, forcing the transmission media into contact with the surface features of the core, and (C) the transmission media and core are twisted to close the cable and a cable jacket is applied.

Claim 1 reads as follows:

1.  A method of producing a cable, comprising steps of:

[1a] passing a plurality of transmission media and a core through a first die which aligns the plurality of transmission media with surface features of the core and prevents twisting motion of the core;

[1b] bunching the aligned plurality of transmission media and core using a second die which forces each of the plurality of transmission media into contact with the surface features of the core which maintain a spatial relationship between each of the plurality of transmission media;

[1c] twisting the bunched plurality of transmission media and core to close the cable; and

[1d] jacketing the closed cable.

('503 Patent, A53-A61 at col. 6, ll. 4-17.)

Dependent claims, such as claim 2, add a third die, before the first die, to center the core relative to the transmission media:

2. The method of claim 1, further comprising the steps of:

8

before passing the transmission media and the core through the first die, passing the transmission media and the core through a third die which generally centers the core relative to the plurality of transmission media.

('503 Patent, A53-A61 at col. 6, ll. 4-17.)[1]

The arrangement of the dies is illustrated in Figure 4 of the '503 Patent, while a cross-sectional view of a cable constructed using the '503 Patent's method is shown in Figure 2, with a "+"-shaped "core" separating four twisted pair transmission media inside an outer cable jacket:



('503 Patent, A53-A61 at A55)          ('503 Patent, A53-A61 at A54)

The '503 Patent was previously asserted in *Belden Technologies, Inc. and Belden CDT (Canada) Inc. v. Superior Essex Inc. and Superior Essex Communications LP*, Case No. 08-cv-063-SLR (D. Del.).  In that case, a jury found that claim 1 was anticipated by U.S. Patent No. 4,385,485 (the "'485 Patent") and

---

[1] Claim 1 is the patent's only independent claim.

obvious in view of Japanese Sho56-7307 ("JP '307"), and the District Court upheld the jury verdict following post-trial motions. (*See, e.g.,* A375.) *However*, the jury verdict was subsequently vacated, prior to appeal, when the case was settled. (*See id.*; A404-A405.) That prior art was then cited in Berk-Tek's Petition, but the Board declined to institute IPR on those grounds. (A126.)

The '503 Patent was also the subject of an *ex parte* reexamination filed by Superior Essex, Control No. 90/009,466. (*See, e.g.,* A415-A457 at A417, A422.) Both of the references that form the bases for the grounds upon which the Board granted the instant IPR (the '582 Patent and JP '910) were of record in the *ex parte* reexamination and the claims were **confirmed** in a Reexamination Certificate that issued on October 5, 2010, which also added claims 5-6. ('503 Patent, A53-A61 at A59-A61.) The Examiner in the *ex parte* reexamination specifically reconsidered earlier rejections based on JP '910, agreeing that the reference did not teach a die that functions to prevent twisting of the core, as required by claim 1 of the '503 Patent. (A407-A410 at A410.)

## B.    The *Inter Partes* Review of the '503 Patent

### 1.    Berk-Tek's Petition Relied Solely on Attorney Argument, *Not* Evidence

JP '910 is an old patent (from 1982), directed to a method for creating a particular kind of "quad" cable that has a "thread-like object 1" separating four uninsulated single-wire "communication cable conductors" (4a-d). Figure 4 of JP

10

'910 shows "quads," *i.e.*, four bare copper wires (each of which is one of the members of the quad), rather than twisted conductor pairs as in the '503 Patent. (JP '910, A211-A216 at A216.)  The cable itself is composed of a number of these quad transmission lines.  (A210-A216 at A214.)



(JP '910, A211-A216 at A216)

The "thread-like object" and the conductors are guided to a wire-splitting board 5 that places the thread-like object at the center and the conductors around it at 90 degree intervals.  (JP '910, A211-A216 at A214-A215.)  Then, "each of the 4 communication cable conductors is inserted into each of the grooves on the thread like object 1 at the location where the communication cable conductors converge," which is "the entrance from the left-right alternating stranding device," numbered 8 in the figure, which performs alternating S-Z stranding. (*Id.*)

It is Petition, Berk-Tek admitted that "the JP '910 reference does not discuss the concept of preventing the twisting of the core," but nevertheless argued that it was "both inherent and obvious that die 5 . . . prevents the core from twisting."

11

(A146.)  Berk-Tek then pointed to this passage of JP '910 in support of this

argument:

> Above all, great care must be taken when stranding 4 single
> communication wires into a quad in the process.  That is, when the
> conductor of each single cable is not placed at each of the vertex of a
> square on the cross-section of the quad stranded wire, cross talk
> occurs by electromagnetic coupling and capacitive coupling.

(*See* A146; JP '910, A211-A216 at A214.)  According to Berk-Tek's Petition, the

"above all" language showed that "it is inherent *in the manufacturing process of*

*the cable of the JP '910 reference* to prevent the twisting (or slipping) of the core

in relation to the transmission media."  (A146 (emphasis added).)

Berk-Tek's Petition further asserted that JP '910's die 5 would be the

"inherent and obvious" location to control twisting of JP '910's "thread-like

object" because "[i]f this task is left to the bunching and twisting die 8, the chance

is introduced that a slippage has already occurred, die 8 has compressed the

conductors to the core and the conductors have been misplaced" and because of

"unfettered access" to the "thread-like object" at die 5.  (A146-A147.)

Notably, Berk-Tek made these arguments in its Petition *without the support*

*of any evidence of any kind—no testimony of an expert, a person of ordinary skill*

*in the art, or anyone else*.  In fact, the Petition does not even explain what the level

of ordinary skill in the art should be.

12

### 2.     The Board Instituted *Inter Partes* Review Based on the Petition's Attorney Argument

In its Decision Instituting the IPR, the Board confirmed that JP '910 did not discuss preventing twisting motion of a core, stating that "[t]he disclosure of JP '910 does not describe specifically how core 1 passes through wire-splitting board 5 beyond simply that at the center of wire-splitting board 5 is a hole through which a core 1 passes." (A415-A457 at A442.) The Board found that "it is speculative to say that there is a structure on wire-splitting board 5 which prevents twisting of the core" and correctly concluded that Berk-Tek's inherency arguments concerning JP '910 were unpersuasive. (A415-A457 at A442.)

Nevertheless, based on the "above all" passage in JP, the Board found as follows:

> JP '910 articulates a special need to have the wires aligned at precise locations on the core during stranding after passing through wire-splitting board 5, one with ordinary skill in the art would have known that the passage of core 1 through wire-splitting board 5 preferably should be made such that twisting of the core causing misalignment of the wires would be prevented.

(A415-A457 at A445.)

As to claim 2, the Board found that "[t]he specification of JP '910 does not disclose an additional die placed upstream of the wire-splitting board 5, through which both the transmission media and the core pass and by which the core generally is centered relative to the plurality of transmission media." (A415-A457

13

at A446.)  The Board concluded that "[w]e agree with [Berk-Tek] that it would have been obvious to one with ordinary skill in the art, in view of either die 71 in '582 or die 31 in JP '694, to add an additional such die to the assembly disclosed in JP '910."  (A415-A457 at A447.)

As to claim 3, even with no discussion of the level of ordinary skill in the art and not an iota of relevant evidence in support, the Board purported to find the fact that "one with ordinary skill in the art would have known to extrude core 1 at such a central location because the four transmission media 4a, 4b, 4c, and 4d, will be placed on core 1 about 90 degrees apart around the generally circular periphery of the core as is shown in Figure 4 of JP '910."  (A415-A457 at A449.)

Finally, as to claim 4, the Board found that "in light of the need to place transmission media 4a, 4b, 4c, and 4d, into the grooves created by heated rollers 2a, 2b, 2c, and 2d, it would have been obvious to one with ordinary skill in the art to extrude core 1 in an in-line manner such that the grooves thereon are aligned axially with the transmission media to facilitate insertion of the transmission media into the corresponding grooves."  (A148.)

### 3.    Belden's Response Was Supported by the Testimony of a Person of Ordinary Skill in the Art

As indicated above, prior to filing its Patent Owner Response, Belden filed a Request for Rehearing of the Board's Decision Instituting IPR.  (A496-A501; A50.)  In its Request for Rehearing, Belden explained that the Board's Grounds 2-

4 (*see* A415-A457 at A444-A445) were based on a misreading of JP '910's "above all" passage (A496-A501 at A500-A501), as it actually was discussing problems with "stranded" (*i.e.*, twisted) prior art quads that were ***avoided/unnecessary*** for the quad taught in the patent.  (*See* A496-A501 at A500-A501.)

In its full Response, Belden addressed the deficiencies of Berk-Tek's Petition and further explained the Board's misreading of JP '910.  In addition, Belden explained why the claims of the '503 Patent were not invalid as obvious in view of JP '910.  Critically, Belden did so with the support of *evidence*, including expert testimony from Mr. Clark, a person of ordinary skill in the art.

> **a.      *JP '910 Concerns a Method of Manufacturing an Alternative to a Twisted "Quad," Not a Data Communications Cable***

Belden's Response and Mr. Clark explained that JP '910 is not directed to high-speed data cables like the '503 Patent, but instead shows an *alternative* to a "stranded" (*i.e.*, twisted) "quad" cable.  (A546-A587 at A574-A575; A588-A622, A601 at ¶ 30.)  Fig. 2 of the '503 patent (below left) shows a cross-section of a cable enclosing four twisted pairs, and Figs. 3 and 4 of U.S. Patent No. 3,364,305 show a quad and cable enclosing a number of quads, respectively:

15



('503 Patent, A53-A61 at AA54; '305 Patent, AA197.)

Mr. Clark explained that "[a] typical 'quad' would be similar to a twisted pair, but would instead have four individually insulated wires that are twisted together; and those twisted quads would then be stranded in groups to form a cable." (A588-A622 at ¶ 30.) Accordingly, Mr. Clark testified that "[a] quad or twisted pair is not a cable unto itself, and, therefore, one of ordinary skill in the art would not understand JP '910 to teach a method of manufacturing high-speed data communications cable." (A588-A622 at ¶ 30; *see also* A546-A587 at A574-A575; A210-A216 at A214 ("stranding two wires or 4 wires into a pair or quad, then binding a number of pairs or quads").)

16

### b. The Petition and the Board's Decision Instituting IPR Misconstrued JP '910's "Above All" Passage

As noted above, both Berk-Tek's Petition and the Board's Decision Instituting IPR relied on a portion of JP '910 that reads "[a]bove all, great care must be taken when stranding 4 single communication wires into a quad in the process . . . ."  (A415-A457 at A444; A146; JP '910, A211-A216 at A214.)  Not having been presented with any evidence, the Board interpreted this passage as showing that "JP '910 articulates a special need to have the wires aligned at precise locations on the core during stranding after passing through wire-splitting board 5."  (A415-A457 at A445.)

As Mr. Clark explained, however, the Board took the quoted passage out-of-context—the point JP '910 was making was the exact opposite of the Board's purported finding.  (A588-A622 at ¶ 71-73; *see also* A546-A587 at A574-A575.) Mr. Clark described how "[t]he excerpted passage simply indicates that the conductors should be placed at the vertices of a square to prevent cross-talk, and explains that the prior art would accomplish this with 'back-stranding' or by winding a thread or tape around the wire to 'retain' a quad stranded arrangement." (A588-A622 at ¶ 72; JP '910, A211-A216 at A214.)  With regard to this back-stranding procedure, the "JP '910 inventor explains that his invention '*advantageously eliminates the shortcomings described above*' by the use of the

17

'thread-like object 1,' which has grooves to receive the conductors and retain them on the vertices of a square." (A588-A622 at ¶ 72; JP '910, A211-A216 at A214-A215.) Mr. Clark explained that "one of ordinary skill in the art would recognize that JP '910 does not articulate any need to control twisting at its wire-splitting board 5." (A588-A622 at ¶ 72.)

In its final decision, the Board agreed that the statement concerns the prior art and not JP '910. The Board found that the very basis for instituting the IPR was (what amounts to) the Board's own misreading of the reference, done in the absence of any evidence from Berk-Tek.

### c.    *A Person of Ordinary Skill in the Art Would Not Have Been Motivated to Control Twisting in JP '910 Using a First Die as in the '503 Patent*

In addition to the absence of an identifiable need to control twisting in JP '910, Mr. Clark identified numerous reasons why a person of ordinary skill in the art would have recognized that controlling twisting at JP '910's wire-splitting board 5 would actually have been ***undesirable***.

First, JP '910 teaches that the "thread-like object 1 [is] composed of a material easily deformable by heat such as rubber or plastic," and, as shown in Figures 2-4 of JP '910, the grooves placed in JP '910's thread-like object are roughly half a wire's diameter in depth. (JP '910, A211-A216 at A215-A216.) Mr. Clark explained that "[o]ne of ordinary skill in the art would recognize that the

18

grooves are not deep enough to control twisting of the thread-like object using a first die with a corresponding core profile," and that "[i]f the die was constructed in a way that would prevent backtwist, it would create forces that would deform the soft core."  (A588-A622 at ¶ 73; *see also* A546-A587 at A577-A578.)

Second, Mr. Clark explained that "one of ordinary skill in the art would recognize that passing a core made of easily deformable rubber or plastic through a first die would create a large amount of friction and heat, and cause the thread-like object to stretch or deform."  (A588-A622 at ¶ 74; *see also* A546-A587 at A577.) Because of the physical properties of the "thread-like object," Mr. Clark explained that "one of ordinary skill in the art would recognize that it would be desirable that the hole in wire-splitting board 5 that the thread-like object passes through create *no friction whatsoever* in order to minimize any residual heat in the thread-like object from JP '910's heated groove cutting step, before the thread-like object reaches the stranding operation (8)."  (A588-A622 at ¶ 74; *see also* A546-A587 at A577.)  A hole large enough to avoid friction would not be able to control the twist of the generally circular thread-like object.

Third, Mr. Clark explained that "a person of skill in the art would recognize that there would be no reason to control twisting using wire-splitting board 5, because JP '910's quad wire is S-Z stranded, meaning any tension placed on the

19

thread-like object would be relieved when the stranding process is reversed throughout the method.  (A588-A622 at ¶ 75; *see also* A546-A587 at A578-A579.)

Mr. Clark's testimony shows that because the JP '910 inventor believed that the problem cited by the Board was solved with his invention—*without suggesting that one would need to or should try to prevent back twist*, and because a person of ordinary skill in the art would recognize that it would not be desirable to try to control twist at JP '910's wire-splitting board 5 for at least three reasons, JP '910 could not render claim 1 of the '503 Patent, or any of its dependent claims 2-6, obvious.  (A588-A622 at ¶ 76; *see also* A546-A587 at A559.)

> **d.    *A Person of Ordinary Skill in the Art Would Not Have Been Motivated to Control Twisting in JP '910 Using a Third Die the '503 Patent***

Claim 2 and claim 3 (which depends from claim 2) add "passing the transmission media and the core through a third die which generally centers the core relative to the plurality of transmission media."  ('503 Patent, A53-A61 at col. 6, ll. 4-17.)  The arrangement of dies, including the "third die," is depicted in Figure 4 of the '503 Patent reproduced above.  (*See supra* IV.A.)

The Board had instituted the IPR on the premise (without an iota of evidence) that "[i]nserting an additional die upstream of wire-splitting board 5 of the assembly of JP '910 involves merely a predicable use of a prior art element

disclosed in each of '582 and JP '694, to achieve the same advantages result." (A415-A457 at A447.)

Mr. Clark explained that the Board's reasoning was incorrect because "a person of ordinary skill in the art would *not* recognize any problem in JP '910 that a placing a third die upstream of wire-splitting board 5 would solve." (A588-A622 at ¶ 79; A546-A587 atA581.) He observed that "one of ordinary skill in the art would recognize in JP '910's manufacturing method a need to reduce drag on the thread-like object in order to minimize stress that could cause the thread-like object to deform or stretch" and that "[a] person of ordinary skill in the art would not be motivated to add a third die to JP '910, because doing so would serve only to generate additional undesirable stress caused by friction of the thread-like object against the opening of the third die, without any apparent benefit." (A588-A622 at ¶ 79; A546-A587 at A582.)

### 4. Berk-Tek's Reply Disclosed Newly Submitted Expert Testimony

Berk-Tek must have known when it filed its Petition that it was going to present its real argument for the first time in its Reply, because Berk-Tek hired Baxter *before* it saw Belden's response brief or Mr. Clark's declaration. (*See, e.g.,* A953-A954 at 8:3-10.) Having submitted *no* expert testimony with its Petition, and despite the clear prohibitions against the submission of new argument and evidence that should have been presented in the original petition, Berk-Tek hired

an expert before seeing Belden's brief, then supplemented its Reply with a *sixty-page* declaration from Mr. Baxter, attaching nineteen new exhibits. (A629; A879; A50.)

### a.    Berk-Tek's New Arguments for Ground 2

With respect to Ground 2, Berk-Tek used Mr. Baxter's declaration to add numerous arguments that did not appear in the Petition. (A644-AA674; A894-A898.) Belden would never have an adequate opportunity to respond to these arguments, because (as discussed below) the IPR procedures do not permit any further briefs, arguments, or evidence from the patent owner.

First, Berk-Tek used Mr. Baxter's Declaration to argue that "twisted pairs and quads are equivalent and both are suitable for high speed communications applications." (A645; A895.) In the referenced portion of Mr. Baxter's Declaration (Ex. 1012, ¶ 108), Mr. Baxter stated that "it is well known in the art that quads and twisted pairs are equivalent, so a quad cable is like a two-pair cable which is suitable for high speed data communications." Not only was this argument *not* included in Berk-Tek's Petition, but it also failed to show that JP '910 would be regarded as describing a method of manufacturing high-speed data communications cable. (*See, e.g.,* A588-A622 at ¶ 30.) Mr. Baxter refers to "quad cables" generally, not the specific *alternative* to the stranded quad described in JP

22

'910.  (JP '910, A211-A216 at A214.)[2]  And, again, Belden could not submit a

brief explaining this, a response from Mr. Clark addressing it, or even slides at the

IPR trial about it,[3] because the evidence was presented for the first time in

petitioner's Reply.

Second, Berk-Tek presented a newly-minted argument that "[t]he size and

shape of the thread-like object in JP '910 has significant enough mass and

dimensions to be gripped by a die and to withstand the prevention of twisting" and

that "comparing the figures of JP '910 and '503, and evidenced by Baxter's

calculations, the thread-like object has about the same cross-sectional area as the

core separator of the '503."  (A646; A896.)  This new argument does not address

the fact that JP '910 specifically teaches that the "thread-like object 1 [is]

composed of a material *easily deformable* by heat such as rubber or plastic."  (JP

'910, A211-A216 at A215-A216 (emphasis added)]; *see also* A588-A622 at ¶ 73;

A546-A587 at A577-A578.)  Berk-Tek's new arguments about the overall cross-

sectional area of JP '910's "thread-like object" and the '503 Patent's core are

---

[2] In fact, so far as anyone knows, the quad described in JP '910 was never actually
manufactured by anyone.  (A981 at 119:10-13.)

[3] The Board prohibits at trial the use of any argument that was not contained in a
previously filed brief.  *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*,
IPR2013-00033 (PTAB Oct. 23, 2013) ("By the time the proceeding reaches final
oral hearing, nothing new can be presented, no new evidence, no new arguments").
Since Belden could not file any further briefing, let alone evidence, Belden also
could not place arguments addressing Baxter's new evidence in its IPR Trial
materials.

unsound because it is the ***"easily deformable" material*** of the thread-like object, not its "mass and dimensions" that would prevent one from adding another die, as explained by Mr. Clark.  And again, Belden could not submit a brief explaining this, a response from Mr. Clark addressing it, or even slides at the IPR trial describing it, because the evidence was presented for the first time in petitioner's Reply.

Third, with respect to Ground 2, Berk-Tek presented new argument that "[c]able materials such as the one used to form the thread-like object can be made of nearly any shape and size with a whole range of materials with various rigidity as desired."  (A646-A647; A896-A897.)  This argument about a "whole range of materials" was not presented in the Petition, nor does it matter given JP '910's specific teaching not to use them, i.e., by using a "thread-like object 1 . . . composed of a material easily deformable by heat such as rubber or plastic."  (JP '910, A211-A216 at A215-A216.)  Berk-Tek and Mr. Baxter provided no reasoned basis to believe that a person of ordinary skill in the art would try to construct a die that firmly grips a material that deforms "easily" or that such a thing could even be accomplished, nor did they explain why (or how) one would or could modify JP '910 by substituting a different material. And, again, Belden could not submit a brief explaining this, a response from Mr. Clark addressing it, or even slides at the

24

IPR trial describing it, because the evidence was presented for the first time in petitioner's Reply.

### b.    Berk-Tek's New Arguments for Ground 3

In its Reply, Berk-Tek purported to address Ground 3 in a mere 5 lines, asserting only that "using extra dies to align and alleviate stresses in a cabling arrangement is simply routine." (A647; A897.) In the portions of Mr. Baxter's declaration that Berk-Tek cites, Mr. Baxter alleges that a third die in the JP '910 method would "more accurately align[] the input wires" and "the speculation about the inherent fragility of the thread-like object is completely unfounded based on anything in the JP '910 document." (A706-A707 at ¶¶ 133-135.)

Again, not only was Mr. Baxter's testimony absent from Berk-Tek's Petition, but it also makes no sense—Mr. Baxter simply ignored JP '910's specific teaching that the "thread-like object 1 [is] composed of a material easily deformable by heat such as rubber or plastic," the integrity of which would be threatened by an additional die. (JP '910, A211-A216 at A215-A216.) And, again, Belden could not submit a brief explaining this, a response from Mr. Clark addressing it, or even slides at the IPR trial describing it, because the evidence was presented for the first time in petitioner's Reply.

25

### 5.    Belden Asked That Berk-Tek's Reply Be Disregarded, but Berk-Tek Was Authorized to File a "Revised" Reply

On September 9, 2013, at Belden's request, a telephone conference was held with the parties and the Board to discuss the propriety of Berk-Tek's Reply and newly disclosed Baxter Declaration, along with its nineteen new attachments. (A874-A878 at A874.)  The Board addressed the issue as follows:  "It also would be unreasonable to expect Petitioner to submit supporting testimony for every matter that possibly may be involved in the dispute.  On the other hand, factual disputes which reasonably should have been anticipated may require supporting testimony."  (A874-A878 at A875.)

With regard to whether Berk-Tek "reasonably should have anticipated" using Mr. Baxter's testimony.  Berk-Tek chose to not include an expert declaration or the testimony of a person of ordinary skill in the art even though, at the time Berk-Tek filed its Petition, Berk-Tek knew of Mr. Baxter, who was previously hired by a Superior Essex Inc., a defendant in the previous district court litigation involving the '503 Patent.  In fact, Berk-Tek's Petition actually cited Mr. Baxter's testimony in that case to support grounds that were not instituted.  (A125.)  Given that PTO had already confirmed the claims over JP '910, it is remarkable that no evidentiary support was offered.  Despite this, the Board stated that it would not decide the propriety of Berk-Tek's Reply until its Final Written Decision.  (A874-A878 at A875.)

26

The Board did authorize Belden to cross-examine Mr. Baxter and file a motion for observations on cross-examination, but limited Belden to just *five pages* of "observations" that were required to follow a rigid structure that the Board dictated.  (A874-A878 at A876.)

The Board also authorized Berk-Tek to file "a Revised Reply which only removes arguments and which relies on less of the reply declaration currently of record."  (*Id.*)  Berk-Tek filed such a "revised" reply, but, instead of removing arguments as the Board instructed, Berk-Tek removed only citations, stating that "this revised Reply omits citations to the Baxter Declaration referring to claim construction, and to the '503 file wrapper . . . the revised Reply omits further citations to the Baxter Declaration and cites directly to certain attached Appendices."  (A634; A884.)

### 6.    Belden's Motion to Exclude Berk-Tek's Improper Reply Evidence

Pursuant to the Federal Rules of Evidence and the Board's Rules, Belden filed its Motion to Exclude Evidence, including Mr. Baxter's improper declaration (Ex. 2012) and its nineteen attachments.  (A922-A943.)

Specifically, Belden argued that the Board's Rules do not permit petitioners, like Berk-Tek, to sandbag patent owners by saving their evidence for the reply. (A922-A943 at A928-A930; *see* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding opposition or patent owner response.");

27

*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756, 48767 (Aug. 14, 2012) ("a reply that raises a new issue or belatedly presents evidence will not be considered"). Because Berk-Tek did not identify an expert and provide testimony with its Petition, Belden could not depose any expert before filing its Response.

As discussed in Belden's Motion to Exclude, Berk-Tek's Revised Reply contained the tacit admission that portions of Mr. Baxter's declaration were improper; Berk-Tek stated that its Revised Reply "omits citations to the Baxter Declaration referring to claim construction, and to the '503 file wrapper." (A884). (A922-A943 at A940-A931.) Berk-Tek did that because, as Mr. Baxter admitted at deposition, those portions of his declaration were not responsive to Mr. Clark's testimony, *i.e.*, they were admittedly improper reply subject matter. (A912-A921at A918; A988-A898 at 147:23-150:3.)

Regarding the Grounds based on the '582 Patent, Belden identified almost 20 paragraphs of Mr. Baxter's Declaration (Ex. 1012, ¶¶ 48-65) that addressed new argument concerning the construction of claim 1, which requires "surface features of the core which maintain a special relationship between each of the plurality of transmission media." (A922-A943 at A931-A933.) Berk-Tek used Mr. Baxter's Declaration to argue that claim 1 did not require *all* the transmission media (*i.e.*, each twisted pair) to be individually separated by the core, even though neither this

28

construction, nor any related argument, was presented in Berk-Tek's Petition. (A922-A943 at A931-A933.)

Regarding JP '910, Belden argued that Mr. Baxter's testimony was necessary for Berk-Tek to establish a *prima facie* case of obviousness.  For example, Mr. Baxter stated that "[t]he use of the methods of JP '910 could be equally applied to the CA '046 structure by one of ordinary skill in the art as the production of quad cables and twisted pair cables have many overlapping construction considerations and teachings."  (A708, ¶ 138.)  Berk-Tek's Petition says nothing about "overlapping construction considerations and teachings" associated with quad cables and twisted pair cables.  Instead, the Petition merely stated that "JP '910 uses single conductors (4a-4d), but it is known to likewise use twisted pairs with a cross shaped separator—see for example CA '046 at Figure 3."  (A154.)

### 7.    The Board's Final Written Decision Relied Only on the Analysis of Berk-Tek's Belatedly Disclosed Expert Declaration

For Ground 2 in its Final Written Decision, the Board stated that even though JP '910's "above all" language referred to the prior art, "[v]iewed as a whole, JP '910 does teach the importance of avoiding any misplacement of the conductors in relation to the core, as Berk-Tek contends."  (A1-A48 at A26.)  The Board cites no evidence, other than Mr. Baxter.

The Board declined to credit Mr. Clark's testimony regarding the operation and characteristics of S-Z stranders and properties of JP '910's "easily deformable" thread-like object. (A1-A48 at A26-A30.) The Board again relied only on Baxter. (A971-A972 at 81:4-23.)

For Ground 3, the Board again cited only Mr. Baxter's testimony that "using extra dies to align and alleviate stresses in a cabling arrangement is simply routine," holding claims 2 and 3 unpatentable over JP '910 in combination with the '582 Patent or JP '694. (A1-A48 at A33-A35.)

Finally, regarding Belden's Motion to Exclude, instead of excluding the new evidence, the Board parsed the Reply and Mr. Baxter's Declaration, asserting that *some* portions "fairly" responded to Mr. Clark's declaration, and that Belden's Motion was "moot" as to other portions, even though the Rules require that a declaration that includes nonresponsive material be stricken as a whole. (A1-A48 at A43-A46.)

## V.    SUMMARY OF THE ARGUMENT

The Board's obviousness rejection based JP '910 was not supported by substantial evidence. The portion of JP '910 that the Board relied on described a method for making a quad, not a communications cable. Further, even if such a person would have looked at JP '910, they would *not* have recognized a need to control the back-twist of JP '910's "thread-like object." ***Unrebutted*** evidence

30

establishes that a person of ordinary skill in the art would have been motivated to *not* use a "first die" to control back-twist, because JP '910's "easily deformable" thread-like object would become distorted at any such first die, and the nature of S-Z stranding would allow proper placement of JP '910's conductors on the thread-like object without use of a separate die to control twisting, which is exactly how JP '910 already worked.

The Board should not have relied on Berk-Tek's *sixty-page* reply declaration in rendering its decision. Berk-Tek elected not to involve Mr. Baxter in the filing of its Petition, but, instead, to present his evidence only when Belden had no meaningful opportunity to respond to the new evidence and arguments. Mr. Baxter's declaration was *necessary* for Berk-Tek to make out a *prima facie* case of obviousness, as it is the only evidence concerning the knowledge and motivations of a person or ordinary skill in the art that the Board cites in its Final Written Decision. As use of the reply evidence was both fundamentally unfair and impermissible under the Board's own Rules, the Board erred in failing to exclude the declaration and its attachments, and in relying on it.

For these reasons, and as further discussed below, this Court should reverse the Board's Final Written Decision with respect to obviousness in view of JP '910, as well as its denial of Belden's Motion to Exclude.

31

# VI.    ARGUMENT

## A.    STANDARD OF REVIEW

In an IPR, "the petitioner [has] the burden of proving a proposition of unpatentability by a preponderance of the evidence."  35 U.S.C. § 316(e).

The Federal Circuit "reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence."  *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 976-7 (Fed. Cir. 2014).  Claim construction is a question of law.  *In re NTP, Inc.*, 654 F.3d 1268, 1273 (Fed. Cir. 2011).  "Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact."  *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

"The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact."  *Id.*  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

However, "an agency's interpretation of its regulations is neither entitled to deference nor given controlling weight if it is 'plainly erroneous or inconsistent with the regulation' itself."  *AMS Assocs. v. U.S.*, 737 F.3d 1338, 1343 (Fed. Cir. 2013) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

## B.    THE BOARD ERRED IN HOLDING CLAIMS 1 AND 4 OF THE '503 PATENT OBVIOUS UNDER § 103

The Board's determination that claims 1 and 4 of the '503 Patent are invalid as obvious should be reversed, for at least two reasons.

First, the Board's finding that there was a motivation to combine is not supported by substantial evidence, as JP '910 was about making quad transmission lines, not about cables with multiple such lines like the '503 patent and, in any event, the Board relied exclusively on faulty analysis offered by Mr. Baxter, and inexplicably disregarded testimony from Mr. Clark—some of which was *unrebutted*—that one of skill in the art would not have modified the JP '910 as the Board did.

Second, the Board's Final Written Decision improperly and unfairly relied on new evidence regarding the alleged motivation to combine, which was offered for the first time with Berk-Tek's Reply, and to which Belden had no meaningful opportunity to respond.  When that improper new evidence is stripped away, the Board's conclusion on obviousness simply cannot stand.

### 1.    The Board's Finding of a Motivation to Combine Was Not Supported by Substantial Evidence

In the Final Written Decision, the Board found that it would have been obvious to modify JP '910 to control twisting of the thread-like object at the wire-splitting board 5.  The Board reasoned one of skill in the art would have been

33

motivated to do so because "preventing twisting motion of core 1 in relation to board 5 would maintain alignment between grooves 3a, 3b, 3c, 3d and conductors 4a, 4b, 4c, 4d, in accordance with the teaching of JP '910."  (A1-A48 at A28.)

That conclusion is not supported by substantial evidence because the cited portion of JP '910 is not about making cables of the sort that are the subject of the '503 patent.  And, even if that were not the case, Belden's expert, Mr. Clark, explained precisely why the Board's modification of JP '910 would ***not*** have been desirable, and the contrary testimony of Berk-Tek's expert, Mr. Baxter, is (in addition to coming prejudicially late in the process, as discussed below) either indisputably incorrect or simply off-point.

### a.    JP '910 Teaches Making Transmission Lines, Not Cables

JP '910 states that "[i]n a well-known conventional method of manufacturing plastic insulated communications cables, it is necessary to include a process of a cable insulator by extrusion, ***stranding two wires or 4 wires into a pair or quad, then binding a number of pairs or quads***."  (A210-A216 at A214 (emphasis added).)  From this, and as Mr. Clark explained, it is clear that the four conductor quads, like the four conductor structure made by JP '910's method, are meant to be bound together to form a cable.  JP '910 thus addresses only a method of manufacturing an alternative to the "quad" or "pair" components of the cable.  (*See, e.g.*, A210-A216 at A214-A215; A588-A622, ¶ 30.)

34

An example of a cable made from a set of quads can be found in the prior art of record, as shown below, where the excerpt from Fig. 3 shows a single quad and the excerpt from Fig. 4 shows multiple quads assembled into a cable:



(A197; *see also* A55 (showing a cross-section of a cable of the '503 patent, with four twisted pairs).)

The consequence of this is that JP '910 cannot render the claims obvious because it does not describe a "method of producing a cable," "twisting the bunched plurality of transmission media and core to close [a] cable," or "jacketing [a] closed cable." Rather, JP '910 only describes a method for producing a quad, which is just **part** of a cable.

Responding to Mr. Clark's explanation, Mr. Baxter led with the fact that "the title of the JP '910 reference is "A Method of Manufacturing Plastic Insulated Communication Cables." (A214.) While that may be true, it does not change the fact that the system shown in Fig. 3 of the reference, which is the portion of the

reference that is relied on by Berk-Tek and the Board, makes quads, not cables. That cannot reasonably be disputed. Mr. Baxter's only other argument was that "it is well known in the art that quads and twisted pairs are equivalent, so a quad cable is like a two-pair cable which is suitable for high speed data communication." (A962, ¶ 108.) That is beside the point. Even if quads and twisted pairs are equivalent, and even if both are suitable for high-speed communication, they still are not "cables" made of multiple transmission media, *i.e.*, *multiple* twisted pairs or quads. (*See* A53 at col. 1, ll. 11-15 ("High-speed data communications media in current usage include pairs of wire twisted together to form a balanced transmission line. Such pairs of wire are referred to as twisted pairs.").)

Mr. Baxter's testimony shows only that "quads and twisted pairs are equivalent," not that either one is a "cable." Moreover, to the extent Baxter seeks to equate the transmission media and the overall cable, his testimony would be inconsistent with the both JP '910 (in which multiple quads are assembled into cables) and the '503 patent (in which the claimed "cable" includes "transmission media").

The Board made no express findings and engaged in no reasoning on this point. Because JP '910 does not teach a method for making a "cable," it cannot render these claims obvious, and the Board's finding to the contrary cannot be supported by substantial evidence.

36

**b.    *It Would Not Have Been Possible To Control Twisting Of The "Thread-Like Object" Using The "Hole" In The First Die.***

Mr. Clark next explained that "[o]ne of ordinary skill in the art would recognize that the grooves [of JP '910] are not deep enough to control twisting of the thread-like object using a first die with a corresponding core profile," and that "[i]f the die was constructed in a way that would prevent backtwist, it would create forces that would deform the soft core."  (A588-A622 at ¶ 73; *see also* A546-A587 at A577-A578.)  In other words, according to Mr. Clark, one could not modify JP '910 as proposed by the Board because it would cause the soft "thread-like object" to deform.

Mr. Baxter's response was to offer a series of calculations of the ***overall cross-sectional area*** of the '503 Patent's core and JP '910's thread-like object. This was apparently meant to show (using hindsight) that, if the '503 patent's core would not deform, JP '910's thread-like object would not deform because it had a similar cross-sectional area.  (A646; A896-A897.)

That analysis misses the point entirely and cannot be the basis for Berk-Tek carrying its burden of proof because, as Mr. Clark testified, the reason that one of skill in art would not have modified JP '910 was that the reference specifically states that its thread-like object is made of a ***material*** that is "***easily deformable***." The cross-sectional area of the '503 patent is not relevant, because the ***material of***

37

**JP '910 itself** was different and not suitable for the modification that Baxter proposed and the Board accepted. Certainly there was no substantial evidence to suggest that it was.

The differences in material make sense, of course. Baxter and Clark agreed that the JP '910 patent is about making quads, not about what one does with those quads to produce a cable with multiple transmission media. The material suitable for the insulation in JP '910 may be fine for a quad, but that does not make it suitable for the core of a cable having multiple twisted pairs or multiple quads.

More important, for purposes of review, Mr. Baxter's testimony cannot constitute substantial evidence because he simply failed to address the testimony that JP '910's "easily deformable" thread-like object could not be effectively controlled using a first die, because the material would (as stated) "deform." This testimony was **unrebutted**, as Mr. Clark was not cross-examined before the Board and Baxter did not address it.

> **c.    Any Attempt to Control Twist Would Have Deformed the "Thread-Like" Object**

Mr. Clark also explained that "one of ordinary skill in the art would recognize that passing a core made of easily deformable rubber or plastic through a first die would create a large amount of friction and heat, and cause the thread-like object to stretch or deform."  (A588-A622 at ¶ 74; *see also* A546-A587 at A577.)

The Board disregarded Mr. Clark's testimony in favor of Mr. Baxter's assertion that "[w]hen making a cable component such as a separator, a polymer or other material would be selected that can withstand the stresses of the cable manufacturing process."  (A1-A48 at A28.)  As noted, however, JP '910 specifically teaches that the thread-like object must be composed of "easily deformable" rubber or plastic.  (JP '910, A211-A216 at A215-A216.)  There is no reason to believe that a material suitable for making high-speed cable cores (like in the '503 patent) would be suitable for use in the manufacture of quad transmission lines (like in JP '910).  Moreover, Mr. Baxter identified no such "polymer or other material [that] would be selected that can withstand the stresses of the cable manufacturing process" in the prior art and, even if there were such a material (who knows? the evidence is silent), one would have to either (a) ignore the express teaching of JP '910 that the material should be easily deformed (impermissible hindsight), or (b) not use a first die to prevent back-twist.  Based on the prior art, one would indisputably do the latter, meaning that they would not practice the claims.

Mr. Baxter and the Board simply ignored the express teachings of JP '910, instead using the '503 patent as a guide to modify the reference, *e.g.*, substituting a stronger material for the "easily deformable" one JP '910 describes for the sole purpose of manufacturing an invalidity argument.  It is of course well-settled that

such an approach is entirely improper.  *Cheese Sys. v. Tetra Pak Cheese & Powder Sys.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013) ("Obviousness 'cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention.'").

There is ***no*** testimony about why a person of skill in art who was aware of JP '910 would be motivated to substitute, *into a system like JP '910*, a material that was ***not*** "easily deformable."  Nor is there any testimony that such a substitution actually could be made, or would be expected to be successful in JP '910's method.  At most, Mr. Baxter opined that, *if one wanted to modify JP '910 to use a die that limited twisting*, one could use a different material.  He did not say that one could do so consistent with the reference's teaching that one should use an easily deformed material.  But, in any event, the question never arises without there first being a reason to make the modification, which does not exist in the prior art.

More fundamentally, Baxter's analysis fails to appreciate that JP '910 is concerned with providing an alternative to the use of individually insulated conductors (the thread-like object is embedded with bare wires and, itself, serves an insulating function), but not with the construction of cable separators for cables with multiple transmission lines (*i.e.*, multiple twisted pairs or quads), such as the '503 Patent.  (A1-A48 at A40.)  Mr. Baxter's discussion of what materials one might use "[w]hen making a cable component such as a separator" in cables such

40

as that of the '503 patent, with multiple separately insulated conductors, has no

logical connection to what one might use in building a cable like in JP '910, which

would correspond to just one of the multiple transmission media contained in the

cable of the '503 patent.  Belden would have offered additional evidence to rebut

this assertion by Mr. Baxter, but again had no opportunity to do so because

Baxter's evidence was offered in reply only.

### d.    JP '910 Would Not Be Modified Because It Already Had a Mechanism for Placing The Conductors Into the Grooves

Finally, Mr. Clark explained that "a person of skill in the art would

recognize that there would be no reason to control twisting using wire-splitting

board 5 (as in the proposed modification), because JP '910's quad wire is S-Z

stranded, meaning that any tension placed on the thread-like object would be

relieved when the stranding process was reversed throughout the method.  (A588-

A622 at ¶ 75; *see also* A546-A587 at A578-A579.)

In response, Mr. Baxter asserted that "there may be a higher chance of the

wires not correctly entering their grooves during the S-Z stranding operation," and

the Board's Final Written Decision credited this testimony.  (A1-A48 at A29.)

This analysis ***must*** be incorrect, however, because, as Mr. Baxter subsequently

admitted, JP '910's S-Z strander would hold the copper conductors at their correct

locations on the thread-like object, without the use of a die as recited in the '503

41

Patent.  (A912-A921 at A919; A982-A983 at 124:7-125:3.)  In other words, because JP '910 *already* held the conductors in place without the die of the '503 patent, there would be no reason to modify it to add that third die.  The Board's reasoning was *silent* on this fundamental flaw.

Further, Mr. Baxter's statements about S-Z stranding were rank speculation, as he admitted on cross-examination that he had "never actually used [an S-Z strander]," never designed a cable, and never designed a manufacturing operation.  (A912-A921 at A917; A992-A993 at 165:2-22.)  Mere conjecture alone is insufficient to constitute substantial evidence of obviousness.  *See, e.g., In re Huai-Hung Kao*, 639 F.3d 1057, 1067 (Fed. Cir. 2011) ("The Board's own conjecture does not supply the requisite substantial *evidence* to support the rejections"); *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) ("[T]he expert's testimony on obviousness was essentially a conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions.  This is not sufficient and is fraught with hindsight bias.").

## C.    THE BOARD ERRED IN HOLDING CLAIMS 2 AND 3 OF THE '503 PATENT OBVIOUS UNDER § 103

As in an initial matter, because claims 2 and 3 of the '503 Patent depend from claim 1, the claims are not invalid for the reasons discussed above with

respect to claims 1 and 4. The Board's ruling that claims 2 and 3 of the '503 Patent are invalid as obvious is, however, also deficient because the legal determination of obviousness of those claims was not supported by substantial evidence, as it improperly relied on Mr. Baxter's faulty analysis.

As discussed above, Mr. Clark provided multiple reasons why a person of ordinary skill in the art would ***not*** have sought to add a third die to JP '910, including that JP '910 provides a fully operational system without any such a die, and that the addition of a third die would cause the "easily deformable" thread-like object to deform or stretch. (A588-A622 at ¶ 79; A546-A587 at A581-A582.)

The Board's Final Written Decision ignored Mr. Clark's testimony, instead crediting Mr. Baxter's testimony that "speculation about the inherent fragility of the thread-like object is completely unfounded based on anything in the JP '910 document." (A1-A48 at A34.)

The assertion that the "inherent fragility of the thread-like object is completely unfounded" is mystifying given that the reference specifically describes it as "easily deformable." (JP '910, A211-A216 at A215-A216.) In light of this specific teaching, the Board's finding on this point simply cannot be supported by substantial evidence.

Further, Mr. Baxter again fails to take into account the fact that JP '910 is concerned with avoiding the use of individually insulated conductors (A1-A48 at

A40), and he certainly does not explain why one of skill in the art would substitute such a material for the "easily deformable" material that JP '910 was already using.

In other words, Berk-Tek and Mr. Baxter argued, and the Board accepted, that one of skill in the art would have modified JP '910 *two ways*, first by adding the claimed third die and, then, by changing the material used by JP '910 to address problems created by their addition of that third die.  The argument must fail because there is no reason to add the third die in the first place, much less a reason to think that a person of skill in the art would have added a third die that would have caused the problems with the existing system necessitating further modifications that may or may not even have been possible.

The Board asserted that use of a third die in JP '910's method would "perform the same function it was known to perform and to yield no more than one of ordinary skill would expect from such use."  (A1-A48 at A34.)  In doing so, the Board asserted that "the obviousness inquiry need not seek out precise teachings directed to the specific subject matter of the challenged claims, for a court can take account the inferences and creative steps that a person of ordinary skill in the art would employ."  (*Id.* (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)).)  But while that is true, there must *still* be "an apparent reason to combine

44

the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418.

Here, there is no "inference" or "creative step" that would lead to the addition of a third die. The reference provides a complete solution without it (meaning that it would not be performing ***any*** function in a modified system), there is no articulated reason to add it, and the only testimony that is not a bare conclusion is from Mr. Clark, who explains that the addition of another die would have been undesirable to one of ordinary skill in the art because it would have created problems with the easily deformable thread-like object.

This is simply another example of the Petitioner and the Board using the claims is a guide to modify the prior art. That is not permissible, even after *KSR*. *See, e.g., KSR,* 550 U.S. at 421 (citing *Graham v. John Deere Co.,* 383 U.S. 1, 36 (1966) to "warn[] against a temptation to read into the prior art the teachings of the invention in issue"); *Cheese Sys.*, 725 F.3d at 1352 ("Obviousness 'cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention.'").

*     *     *

Because the Board either disregarded or failed to appreciate the multiple reasons why a person of skill in the art would ***not*** make the proposed modifications to JP '910, its obviousness determination is not supported by substantial evidence

45

and should be reversed.  *See, e.g., Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed.

Cir. 2013) (reversing the Board's obviousness ruling where it lacked the support of

substantial evidence); *In re Huai-Hung Kao*, 639 F.3d at 1067.

### D.    THE BOARD'S FINAL WRITTEN DECISION IMPROPERLY RELIED ON NEW EVIDENCE

An IPR is adjudicatory proceeding—"a contested case instituted by the

Board based upon a petition."  *See* 37 C.F.R. § 42.100(a); 37 C.F.R. § 42.2

(defining "trial").  The IPR Petition must include a statement identifying, among

other things, "[t]he specific statutory grounds under 35 U.S.C. §102 or §103 on

which the challenge to the claim is based" and "where each element of the claim is

found in the prior art patents or printed publications relied upon."  37 C.F.R. §

42.104(b)(2), (5).

As noted, claim 1 of the '503 Patent requires a "first die" that "prevents

twisting motion of the core," and Berk-Tek's Petition admitted that "the JP '910

reference does not specifically discuss the concept of preventing the twisting of the

core."  ('503 Patent, A53-A61 at col. 6, ln. 4-17; A145.)

The obviousness argument in the Petition relied ***exclusively*** on JP '910's

"above all" passage, and the Board instituted the IPR because it interpreted this

passage as showing that "JP '910 articulates a special need to have the wires

aligned at precise locations on the core during stranding after passing though wire-

splitting board 5."  (A415-A457 at A445.)

46

As explained above, however, and contrary to Berk-Tek's Petition and the Board's Decision Instituting IPR, the "above all" language referred to something that applied to the *prior art* methods, and specifically *not* the method of JP '910, which was intended to *avoid* that very problem. Thus, the portion of JP '910 that Berk-Tek and the Board cited indisputably does *not* support the idea that it would have been obvious to prevent a core from twisting at wire-splitting board 5, because JP '910 states that the identified problem was *solved* (instead) by use of the grooved thread-like object alone. (A546-A587 at A577; A588-A622 at ¶ 74.) The reference explains that its invention "advantageously eliminates the shortcomings described above by the use of the "thread-like object 1," which has grooves to receive single conductors and retain them on the vertices of a square. (JP '910, A211-A216 at A214-A215.) In fact, during his deposition, Mr. Baxter admitted that JP '910's "above all" language referred to the prior art, *not* JP '910's method: "I think here he is really talking about the prior art." (A912-A921 at A916; A985-A986 at 135:8-137:11.)

Because the Petition failed to provide a proper motivation to modify JP '910, it failed to establish a *prima facie* case of obviousness, and the Board erred in

47

instituting the IPR on this ground.[4]  *See, e.g., Institute Pasteur v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013).

After the IPR was instituted based on the erroneous analysis of JP '910, Belden filed its Patent Owner response, which necessarily was limited to the grounds identified in the Petition and the Board's Decision Instituting IPR—there was nothing else to address.  Belden pointed out that the "above all" passage could not supply a motivation to modify JP '910 and, further, explained that a person of skill in the art would ***not*** have modified the reference as proposed by Berk-Tek and the Board, for a number of technical reasons explained by Mr. Clark, as discussed in Section IV.B.3 above.

Berk-Tek then filed its Reply, to which it attached the new, sixty-page Declaration from its expert, Mr. Baxter.  (Berk-Tek could have engaged Baxter to assist with the Petition, but elected not to, instead hiring him for the reply before even having seen Belden response or Mr. Clark's declaration.)  The Board's Rules provide for ***only*** the Petition, the Patent Owner Response, and the Petitioner's Reply.  Because the Baxter Declaration was filed with the Reply, Belden had no meaningful way to respond to the many new facts offered by Mr. Baxter, some of

---

[4] Belden understands that the decision whether to institute the IPR is not itself appealable.  *St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*, 749 F.3d 1373, 1376 (Fed. Cir. 2014).

which ultimately formed the basis for the Board's conclusion of obviousness, as detailed below in Section E.2.

As the Board's own Rules did not provide Belden any opportunity to respond to the new Baxter evidence, and the Board's decision depended on that new evidence, the decision of the Board that claims 1 and 4 were obvious should be reversed.  *See, e.g., Rambus*, 731 F.3d  at 1256 (holding in an *inter partes* reexamination that the Board committed reversible error by adopting a new motivation to combine the references that the patent owner did not have a fair opportunity to respond to)*; In re Stepan Co.*, 660 F.3d 1341, 1345 (Fed. Cir. 2011) ("Allowing the Board unfettered discretion to designate a new ground of rejection—when it relies upon facts or legal argument not advanced by the examiner—would frustrate the notice requirements of the APA.")

### E.    THE BOARD ERRED IN DENYING BELDEN'S MOTION TO EXCLUDE EXPERT TESTIMONY UNDISCLOSED UNTIL BERK-TEK FILED ITS REPLY

#### 1.    The Board Rules Require It To Disregard Improper Replies in Their Entirety

"It is a familiar rule of administrative law that an agency must abide by its own regulations." *Ford Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990); *Align Tech., Inc. v. ITC*, 2014 U.S. App. LEXIS 13717, *12 (Fed. Cir. Jul. 18, 2014) (same).

Pursuant to 37 C.F.R. § 42.22(a), "[e]ach petition . . . must include . . . [a] full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence including material facts, governing law, rules, and precedent."  Addressing the proper content of a reply, 37 C.F.R. § 42.23(b) provides that "[a] reply may only respond to arguments raised in the corresponding opposition or patent owner response."  *Cf. Amoco Oil Co. v. United States*, 234 F.3d 1374, 1377 (Fed. Cir. 2000) ("[A] party must raise in its opening brief all issues it wishes to challenge, and should not rely on an opponent to raise them."); *Carbino v. West*, 168 F.3d 32, 34 (Fed. Cir. 1999) (collecting "substantial and well-established precedent in other courts . . . holding that issues initially raised in a reply brief should not be entertained."); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (noting that "arguments not raised in the opening brief are waived").

Implementing these regulations, the PTO has published in the Federal Register an "Office Patent Trial Practice Guide" (the "Trial Practice Guide") that "is intended to advise the public on the general framework of the rules, including the structure and times for taking action in each of the new proceedings" under the AIA, including in IPRs.  *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756 (Aug. 14, 2012).

Regarding the presence of newly-minted argument and evidence in a reply, the Trial Practice Guide provides as follows:

> A reply may only respond to arguments raised in the corresponding opposition. § 42.23. While replies can help crystalize issues for decision, *a reply that raises a new issue or belatedly presents evidence will not be considered and may be returned.* **The Board will not attempt to sort proper from improper portions of the reply.** *Examples of indications that a new issue has been raised in a reply include* **new evidence necessary to make out a prima facie case for the patentability or unpatentability of an original or proposed substitute claim, and new evidence that could have been presented in a prior filing**.

*Id.* at 48767 (emphasis added); *see, e.g., Blackberry Corp. v. Mobilemedia Ideas, LLC*, IPR2013-00036 (PTAB Jul. 26, 2013) (Paper 40, pp. 2-3).  Berk-Tek used Mr. Baxter's Declaration for precisely this prohibited purpose.

### 2.    *The Board Improperly Failed to Exclude and Disregard the Baxter Declaration*

Although factually incorrect, Mr. Baxter's declaration was clearly necessary for Berk-Tek to even attempt to establish a *prima facie* case of obviousness.

### a.    *The Baxter Declaration Was Necessary for Berk-Tek's Prima Facie Case*

As explained above, the Petition's conclusory attorney argument was supplemented with unadorned attorney argument that various modifications to JP '910 would have been "inherent and obvious," in some instances as matters of unelaborated "design choice."  (A146, A154.)  Under the Board's rules, mere citation to a portion of the prior art does not preserve argument that was

51

undeveloped in the Petition. *BAE Sys. Information & Electronic Sys. Integration, Inc. v. Cheetah Omni, LLC*, IPR2013-00175 (PTAB Jun. 19, 2014) (Paper 45, p. 15) (declining to consider new argument, because "[a]lthough [Petitioner] cited Figure 20 in its Petition, it did not develop this argument in its Petition").

Unsupported by any *evidence*, Berk-Tek's attorney arguments were plainly insufficient to establish a *prima facie* case of obviousness. *See, e.g., KS HIMPP*, 110 U.S.P.Q.2D (BNA) at 2030 (explaining that "the Board cannot accept general conclusions about what is 'basic knowledge' or 'common sense' as a replacement for documentary evidence for core factual findings in a determination of patentability." (citing *In re Zurko*, 258 F.3d 1369, 1385-6 (Fed. Cir. 2001).)

In denying Belden's Motion to Exclude, the Board stated that "we are satisfied that Mr. Baxter's declaration, including the appendices and his CV, generally are in fair reply to Mr. Clark's declaration and/or Belden's response to the revised petition." (A1-A48 at A46.) That is beside the point, because it cannot legitimately be disputed that the material in Mr. Baxter's Declaration was **necessary** for Berk-Tek's *prima facie* case of obviousness, as well as for the Board's Final Decision on Grounds 2 and 3.

Baxter's Declaration was "in reply to Mr. Clark's declaration and/or Belden's response to the revised petition" only because Belden and Mr. Clark pointed out that Berk-Tek had not established a *prima facie* case of obviousness. If

filling holes in the *prima face* case is in "fair reply," then the discussion of "new issues" in the Trial Practice Guide is meaningless, there is little reason for any petitioner to make its full case in the Petition, and patent owners will regularly find themselves at risk of losing claims for lack of a fair chance to respond to attacks on their patents.

Indeed, the *only* "evidence" that the Board's Final Decision relies on regarding the supposed teachings of the prior art is Mr. Baxter's reply Declaration. For example, the portion of the Final Written Decision addressing obviousness based on JP '910 included the following, where Exhibit 1012 is the Baxter Declaration:

- "A person with ordinary skill in the art would have recognized that such alignment of the grooves on core 1 with the fixed positions of the conductors on board 5 cannot be maintained if core 1 twists in relation to board 5.  *See* **Ex. 1012, ¶ 121**."

- "We are persuaded that board 5 could have been used to prevent twisting of core 1 by one with ordinary skill in the art exercising ordinary creativity.  *See* id. at 421; Reply to PO Resp. 11-14; **Ex. 1012, ¶¶ 118-131**."

- "For example, as explained by Berk-Tek's expert, Mr. Baxter, a person skilled in the art would have recognized that a material, such

53

as a heat recoverable polymer that changes shape by extrusion, could have been used as a core to separate the conductors of the quad disclosed in JP '910.  **Ex. 1012, ¶¶ 124-126**."

- "Such a material, according to Mr. Baxter's testimony, 'solidifies into a new form that would engage the die so as to prevent the back twisting motion of the core.'  **[Ex. 1012] at ¶ 126**."

- "Belden overlooks the significance of the teaching of JP '910 with respect to alignment.  *See* PO Resp. 24-28; **Ex. 1012, ¶ 121**."

- "Berk-Tek argues that 'Clark's contention that it is not possible to prevent the twisting of the JP '910 thread-like object (core) because it is small, is speculative' and '[t]he size and shape of the thread-like object in JP '910 has significant enough mass and dimensions to be gripped by a die and to withstand the prevention of twisting.'  Reply to PO Resp. at 13 (citing **Ex. 1012, ¶¶ 126-131**)."

- "Berk-Tek also argues that "[i]f the walls surrounding the grooves are strong enough to keep the wires within their intended grooves during the twisting operation, then they would likewise be strong enough to hold a grip against a die."  *Id.* at 13-14 (citing **Ex. 1012, ¶ 128**)."

- "Berk-Tek further argues that "Clark's proposition that the JP '910 thread-like object (core) is too deformable because of extrusion and

thus would not be able to withstand a die that prevents its rotation is incorrect" because "[w]hen making a cable component such as a separator, a polymer or other material would be selected that can withstand the stresses of the cable manufacturing process." *Id.* at 14 (citing **Ex. 1012, ¶¶ 123-124**)."

- "The fact that the stranding in JP '910 is S-Z instead of uni-directional helical is immaterial." *Id.* (citing **Ex. 1012, ¶¶ 118-119**)."

In fact, Mr. Baxter's testimony is the ***only evidence*** regarding the supposed motivations and knowledge of a person of ordinary skill in the art that the Board relied on to support its obviousness finding. (A1-A48 at A19-A36.)

Furthermore, this was confirmed at the final hearing. There, the Board questioned Berk-Tek's counsel extensively about where in JP '910 the specific motivation to control backtwist could be found. When Berk-Tek's counsel could identify none, the Board instructed counsel: "Can you hopefully refer us to something that you can find in the record? Well, you can tell us when you come up the next time, how's that?" (A1391-A1395 at 27:16-31:8.) When Berk-Tek's counsel stood up again, all that counsel could point to for support was *Baxter's belated Reply declaration.* (A1438 at 74:13-23.)

Because this material was, without question, required to establish the *prima facie* case, it is clearly prohibited by the Trial Practice guide as a new issue. *See* 77

Fed. Reg. at 48767; *see, e.g., Harmonic, Inc. v. Avid Tech., Inc.*, IPR2013-00252 (PTAB Jul. 10, 2014) (Paper 27, p. 26) ("Petitioner's improper argument raised for the first time in the Reply will not be considered, because it is not accompanied by a showing of good cause explaining why it could not have been presented in the Petition.").

There was **nothing** preventing Berk-Tek from providing a declaration from Mr. Baxter to support the Petition—Berk-Tek made the tactical decision not to—Berk-Tek certainly knew who Mr. Baxter was, as it cited his prior testimony at the district court jury trial (to support a non-instituted ground).  (A125.)  *See Shaw Indus. Group, Inc. v. Automated Creel Sys., Inc.*, IPR2013-000132 (PTAB Jul. 24, 2014) (Paper 42, p. 23) ("[Petitioner] does not provide any reason, however, as to why the changes proposed in its Reply could not have been discussed earlier in the Petition.").

Berk-Tek should be held to its strategic decision, and not be permitted sandbag Belden by withholding its true arguments until its Rely, where the Board's rules do not allow for a response from Belden.

### b.    *The Board Failed to Follow Its Own Rules That Prohibited it from Parsing Declaration*

As noted above, the Trial Practice Guide provides that "[t]he Board will not attempt to sort proper from improper portions of the reply."  Yet that is **exactly** what the Board did in this instance.

56

For some instances in which Belden showed that statements in Mr. Baxter's Declaration were improperly new, the Board concluded that those portions were not explicitly cited, and therefore concluded that Belden's Motion to Exclude was "moot." (A1-A48 at A44-A46.) The objections were not "moot" if the Board was following its own rules.

In other instances, the Board concluded that Belden's Motion to Exclude was moot because Belden was able to prevail on the merits *despite* Berk-Tek's improper reply arguments. (*See, e.g.,* A1-A48 at A45 ("Belden's argument is moot and need not be reached, because even without excluding Mr. Baxter's declaration, we have determined that the '582 patent does not anticipate.").) Again, however, the Board's own Rules could not be more clear: "[t]he Board will not attempt to sort proper from improper portions of the reply." 77 Fed. Reg. 48756 at 48767. Belden should not have been required to expend resources and its *very* limited cross-examination observations (discussed below) addressing improper arguments. The fact that Belden prevailed on a point does not make the impropriety of the Baxter Declaration under the Rules "moot."

Because Mr. Baxter's reply declaration unquestionably included improper new material, it should have been excluded *in its entirety*. *See, e.g., The Scotts Co. LLC v. Encap, LLC*, IPR2013-00110 (PTAB Jun. 24, 2014) (Paper 79, p. 6 n.3) ("The fact that the declaration may contain some material appropriate for a

response does not require our consideration of them, as the Board will not attempt to sort the proper form the improper portions."). Since the Board relied exclusively on that declaration, calling its exclusion "moot" is utterly illogical.

The Board's arbitrarily lenient treatment of Berk-Tek's clear violation of the Board's Rules stands in stark contrast to the Board's treatment of Belden, which was held to the letter of the Trial Practice Guide.

The Board allowed Belden to cross-examine Mr. Baxter on the direct testimony in his Declaration but, drawing on another portion of the Trial Practice Guide, allowed the cross-examination into the record only as "observations on cross-examination," limited to a ***five page document*** whose form and language the Board specifically dictates. (A874-A878 at A876; *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756, 48768 (Aug. 14, 2012).) Thus, Belden was required to (and did) follow the Rules, to its substantial detriment, and Berk-Tek did not.

This situation was particularly egregious given that Mr. Baxter's Declaration stretched to sixty pages, and attached nineteen new exhibits, meaning that the declaration alone was substantially longer than Berk-Tek's forty-five page Petition (Paper 4). Belden absolutely did not have a fair opportunity to address Mr. Baxter's opinions in five pages of cross-examination observations alone.

The Baxter declaration should have been put in with the Petition, in which case Belden would have been able to depose him and respond with its own expert

58

declaration and in the sixty pages provided for the Patent Owner's Response.  That is how the PTAB's process is intended to operate, and the Board's unjustified deviation from that process in this instance put Belden at a grossly unfair disadvantage.

The Board's decision to allow Berk-Tek to put in a sixty page declaration, with hundreds of pages of exhibits on reply, while affording Belden just five pages of observations to respond, was an abuse of discretion.  *See, e.g., The Scotts Co. LLC*, IPR2013-00110 (PTAB Jun. 24, 2014) (Paper 79, p. 5) ("By waiting to serve this evidence on [Patent Owner] in [Petitioner's] Reply, [Patent Owner] was denied the opportunity to file responsive evidence.").

IPR's are a brand of litigation governed by the Federal Rules of Evidence. 37 C.F.R. § 42.62(a).  It is difficult to imagine a district court litigation where a patentee presents no expert evidence of invalidity, a patent owner responds with expert testimony, and the party challenging validity is permitted to then present its entire case-in-chief by way of rebuttal expert.  It erroneously turns the burden of proof, and proper procedure, on its head.  *See, e.g., Rambus Inc.*, 731 F.3d at 1255 (holding the Board committed reversible legal error by "placing the burden on [the patent owner] that its claims were not obvious").

As the Board stated in another IPR proceeding, "[*i*]*nter partes* review proceedings must be fair to both parties, including the patent owner—where

propert[y] rights can be extinguished though cancellation of patent claims."

*Corning Inc. v. DSM IP Assets B.V.*, IPR2013-00047, Paper 84, p. 17 (PTAB May

1, 2014) ("Based on our interpretation of our rules, we have determined that

Corning's "new" evidence in support of its unpatentability position should not be

considered.").

Because Baxter Declaration was plainly improper, the Board erred in

denying Belden's Motion to Exclude and refusing to disregard the Declaration in

its entirety.

Without the Declaration, there is no evidence of any motivation to combine,

and the obviousness rejections should be reversed.

## VII.    <u>CONCLUSION AND STATEMENT OF RELIEF SOUGHT</u>

Because the Board's holding in the IPR is both legally and factually

incorrect, and because the Board should have excluded Berk-Tek's improper Reply

evidence, Belden respectfully requests that this Court reverse the Board's Final

Written Decision and enter Judgment that claims 1-4 of the '503 Patent are valid.


Dated: September 25, 2014                    Respectfully submitted,

                                             /s/ Matthew B. Lowrie
                                             Matthew B. Lowrie
                                             Aaron W. Moore
                                             Matthew A. Ambros
                                             FOLEY & LARDNER LLP
                                             111 Huntington Avenue
                                             Boston, MA 02199
                                             P: (617) 342-4000
                                             F: (617) 342-4001

                                             *Attorneys for Appellant Belden Inc.*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 46
Entered:  March 18, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

BERK-TEK, LLC
Petitioner

v.

BELDEN INC.
Patent Owner

———————

Case IPR2013-00057
Patent 6,074,503

———————

*Before* JAMESON LEE, JOSIAH C. COCKS, and RICHARD E. RICE,
*Administrative Patent Judges*.

RICE, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

**A1**

Case IPR2013-00057
Patent 6,074,503

## I.    BACKGROUND

A.    Introduction

Petitioner, Nexans, Inc. ("Nexans"), filed a petition on November 19, 2012, for an *inter partes* review of claims 1-6 of U.S. Patent No. 6,074,503 ("the '503 patent") pursuant to 35 U.S.C. §§ 311-319.  Nexans filed a revised petition on November 28, 2012.  Paper 4 ("Pet.").  On April 16, 2013, the Board instituted a trial for claims 1-6, on one or more grounds of unpatentability.  Paper 11 ("the Institution Decision" or "Inst. Dec.").  On April 18, 2013, Nexans informed the Board of Nexans's successor in interest, Berk-Tek, LLC ("Berk-Tek"), which is now the real party in interest for Petitioner.  Paper 13.

After institution of trial, Belden Inc. ("Belden") filed a patent owner response ("PO Resp.") to the petition.  Paper 25.  Berk-Tek filed a reply to the patent owner response (Paper 28) and, subsequently, a revised reply to the patent owner response (Paper 30, "Reply to PO Resp.").  Belden later filed a motion to exclude evidence (Paper 36, "Mot. Excl."), to which Berk-Tek filed a response (Paper 40).  Belden then filed a reply to Berk-Tek's response to the motion to exclude evidence.  Paper 44.

An oral hearing was held on November 20, 2013.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Berk-Tek has shown that claims 1-4 are unpatentable.

Berk-Tek has not shown that claims 5 and 6 are unpatentable.

---

[1] A transcript of the oral hearing is included in the record as Exhibit 3001.

Case IPR2013-00057
Patent 6,074,503

Belden's motion to exclude is denied.

B.    The '503 Patent

The challenged claims are directed to a method of producing a cable.
Ex. 1002, 3:3-4. The method includes a step of passing a plurality of transmission
media, such as a plurality of twisted pairs of individually-insulated conductors, and
a core through a first die that aligns the plurality of transmission media with
surface features of the core and prevents twisting motion of the core. *Id.* at 3:4-8,
34-35. The method includes a subsequent step of bunching the aligned plurality of
transmission media and core using a second die that forces each of the plurality of
transmission media into contact with the surface features of the core, such that the
core maintains a spatial relationship between each of the plurality of transmission
media. *Id.* at 3:8-13. In the last recited steps of the method, the bunched plurality
of transmission media and core are twisted to close the cable, and the closed cable
is jacketed. *Id.* at 3:13-15.

An embodiment of the method of producing cable is illustrated in Figure 4
(*id.* at 3:27-29), which is reproduced below:

3

**A3**



Fig. 4

Figure 4 illustrates a die system used to
practice a method of the '503 patent for making a cable

According to the specification, it was well known in the art that, when plural
elements are cabled together, an overall twist is imparted to the assembly in order
to improve geometric stability and to help prevent separation.  *Id.* at 4:56-58.  As
described in the specification, the "twisting of the profile of the core along with
individual twisted pairs is controlled" in embodiments of the invention, such that
the core maintains a physical spacing between the twisted pairs.  *Id.* at 4:59-63.  It
is represented that "the process assists in the achievement of and maintenance of

4

**A4**

Case IPR2013-00057
Patent 6,074,503

high crosstalk isolation by placing a conductive core in the cable to maintain pair spacing." *Id.* at 4:64-67.

In the embodiment of Figure 4, the plurality of transmission media are four twisted pairs of individually-insulated conductors (*id.* at 3:33-35); the profile of an extruded core has the initial shape of a "+," providing four channels (*id.* at 3:47-49); and each channel carries one twisted pair (*id.* at 3:49-51). That configuration is illustrated in Figure 1 of the '503 patent, reproduced below:



Fig. 1

Figure 1 illustrates a cross-sectional view of a cable core
with four twisted pairs, shown in phantom lines, separated thereby

As illustrated in Figures 1 and 4, core 101 (*see* Fig. 1) is brought through opening 407 of die 411 (*see* Fig. 4) and each of four twisted conductor pairs 103 (*see* Fig. 1) is brought through respective openings 409 of die 411 (*see* Fig. 4). *Id.* at 5:8-10. Then, a bunching operation is performed in which the four twisted pairs are pushed into channels 105 of the core (*see* Fig. 1) by die 413 (*see* Fig. 4). *Id.*

5

**A5**

Case IPR2013-00057
Patent 6,074,503

at 5:12-14.  A final twist is imparted to the cable after the bunching.  *Id.* at 5:14-17.
According to the specification, "die 411 eliminates back twist, which is inherent in
bunching operations, thus allowing . . . die 413 to place the pairs in the channels
prior to the twisting" and "[t]he cable twist is imparted to the cable assembly after
the second die 411, which locates the twisted pairs relative to the extruded core
profile."  *Id.* at 5:14-19.

Figure 4 also illustrates use of die 403 to provide initial alignment of the
core and the four twisted pairs upstream of die 411.  *Id.* at 5:6-11.  As illustrated in
Figure 4, the core passes through central opening 401, and the four twisted pairs
pass through respective openings 405.  *Id.* at 5:6-11, Fig. 4.

C.    The Alleged Grounds of Unpatentability

The prior art references as applied to claims 1-6 are:

| the '582 patent | US 4,393,582 | July 19, 1983 | Ex. 1003 |
|---|---|---|---|
| JP '694 | Japanese S52(1977)-76694 | | |
| | English Translation | June 28, 1977 | Ex. 1007 |
| JP '910 | Japanese Sho57(1982)-19910 | | |
| | English Translation | Feb. 2, 1982 | Ex. 1008 |
| CA '046 | Canadian 2,058,046 | Aug. 22, 1992 | Ex. 1010 |

Citations to JP '694 and JP '910 refer to their English translations, Ex. 1007
and Ex. 1008, respectively.

Case IPR2013-00057
Patent 6,074,503

The Board instituted trial on the following grounds of unpatentability:

| Reference(s) | Basis | Claims Challenged |
|---|---|---|
| the '582 patent | § 102 | 1 and 2 |
| JP '910 | § 103 | 1 and 4 |
| JP '910 and either the '582 patent or JP '694 | § 103 | 2 and 3 |
| JP '910 and CA '046 | § 103 | 5 and 6 |

## II.    DISCUSSION

A.    Introduction

Determining appropriate constructions of the claim terms "a plurality of transmission media," "twisting motion," and "surface features" is a first step to the patentability analysis of claims 1-6.

Claim 1, which is the sole independent claim, is reproduced below (emphasis added):

1.    A method of producing a cable, comprising steps of:

passing *a plurality of transmission media* and a core through a first die which aligns the plurality of transmission media with *surface features* of the core and prevents *twisting motion* of the core;

bunching the aligned plurality of transmission media and core using a second die which forces each of the plurality of transmission media into contact with the surface features of the core which maintain a spatial relationship between each of the plurality of transmission media;

twisting the bunched plurality of transmission media and core to close the cable; and

7

**A7**

Case IPR2013-00057
Patent 6,074,503

jacketing the closed cable.

As quoted above, claim 1 requires: passing a plurality of transmission media and a core through a first die; bunching the aligned plurality of transmission media and core using a second die; twisting the bunched plurality of transmission media and core to close the cable; and jacketing the closed cable. Claims 2, 4, and 5 depend from claim 1; claim 3 depends from claim 2; and claim 6 depends from claim 5.

B.    Claim Construction

1.    Principles of Law

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). Claim terms also are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). Neither Berk-Tek nor Belden contends that the specification of the '503 patent, as filed, coined a new meaning for any term.

8

**A8**

Case IPR2013-00057
Patent 6,074,503

The challenge is to interpret claims in view of the specification without unnecessarily importing limitations from the specification into the claims. *See E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003). If a feature in the disclosure is not necessary to give meaning to what the inventor means by a claim term, it would be "extraneous" and should not be read into the claim. *Renishaw PLC*, 158 F.3d at 1249; *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988). The construction that stays true to the claim language and most naturally aligns with the inventor's description is likely the correct interpretation. *See Renishaw PLC*, 158 F.3d at 1250.

    *2.*    "a plurality of transmission media"

The crux of the dispute between the parties is not over the meaning of "a plurality" or "transmission media," but whether the combined term "a plurality of transmission media" as used in claim 1 selectively can be applied to less than all of the transmission media of the cable under production. The Board agrees with Belden (PO Resp. 13) that the term "a plurality of transmission media," recited in claim 1, encompasses "all of the media that are closed into the cable, not merely a subset of that media." That is, the term "a plurality of transmission media" cannot be satisfied by "a subset of the media in the cable, such that it would be sufficient for the core to separate any two of the media." *Id.*

Belden argues that, "[c]onsistent with the core's purpose of reducing crosstalk, every embodiment described in the '503 Patent has a core that individually separates each of the twisted conductor pairs from one another." *Id.* at 10 (citing Clark Decl., Ex. 2003, ¶ 46; Ex. 1002). Belden also argues that

9

**A9**

Case IPR2013-00057
Patent 6,074,503

construing "a plurality of transmission media" to encompass "just two transmission media" within a larger group of transmission media comprising a cable would be inconsistent with the teaching of the '503 patent to isolate individually each twisted conductor pair, as well as inconsistent with the language of claim 1 that recites "passing a *plurality of transmission media* and a core through a first die," "bunching the aligned *plurality of transmission media* and core using a second die, and then "twisting the *bunched plurality of transmission media* and core to close the cable." *Id.* at 12-13.

Berk-Tek contends that Belden's arguments "are based not only on a misreading of the plain language of the claims, but also on [Belden's] attempts to read limitations from the specification into the claims." Reply to PO Resp. 5. Berk-Tek argues that "the express language of claim 1 <u>does not</u> require that every single transmission media within the jacket needs to be individually separated by a core, but rather claim 1 only includes various steps including passing '**a** plurality' of transmission media and core through a first die and maintaining a spatial relationship between those 'plurality.'" Reply to PO Resp. 6 (emphasis in original). Berk-Tek further argues that nothing in the specification limits the claim language and that, "although the specification of '503 does have an example of a '+' shaped separator that separates every one of the transmission media from each other, this is only a single embodiment of the specification and does not limit the scope of the claims." *Id.* at 6-7 (citing *Golight Inc. v. Wal-Mart Stores Inc.,* 355 F.3d 1327 (Fed. Cir 2004)). Berk-Tek additionally argues that the following language of the specification confirms that the embodiments are not limiting:

10

**A10**

Case IPR2013-00057
Patent 6,074,503

> "However, the invention is not limited to the number of pairs or
> the profile used in this embodiment. The inventive principles can be
> applied to cables including *greater or fewer numbers of twisted pairs
> and different core profiles*.["] ([quoting] Ex 1002 '503 patent at col. 3,
> line 35-38, emphasis added)[.]

*Id.* at 7 (emphasis in original).

We are persuaded by Belden's arguments, however, that Berk-Tek's
proposed claim construction is inconsistent with the context of the surrounding
language of claim 1. *See, e.g., ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082,
1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also
must be considered"). Claim 1 recites "passing a plurality of transmission media
and a core through a first die which aligns the plurality of transmission media . . .
and prevents twisting of the core," "bunching the aligned plurality of transmission
media and core using a second die . . . which maintains a spatial relationship
between each of the plurality of transmission media," "twisting the bunched
plurality of transmission media and core to close the cable," and "jacketing the
closed cable." As Belden argues (PO Resp. 13), these recited steps suggest a
process of producing a complete, jacketed cable, not a part or subset of the cable,
contrary to Berk-Tek's asserted claim construction.

We also are persuaded that Berk-Tek's proposed claim construction is
inconsistent with the specification. The specification states that, "when plural
elements are cabled together, an overall twist is imparted to the assembly."
Ex. 1002, 4:57-58. The use of "plural elements" in that statement refers to a
plurality of transmission media and implies that the referenced plurality is nothing
less than all of the elements that are cabled together. The specification *next* states
that, "[i]n embodiments of the present invention, twisting of the profile of the core

11

**A11**

along with the individual twisted pairs is controlled," in order "to maintain a physical spacing between the twisted pairs." *Id.* at 4:59-63. That statement describes the process of the invention that is depicted in Figure 4 and indicates that, in the disclosed method, twisting of *all* of the twisted pairs to be cabled together is controlled, and a physical spacing is maintained between each of those twisted pairs, contrary to Berk-Tek's asserted claim construction.

Berk-Tek's reliance on *Golight, Inc.* is misplaced. In that case, Wal-Mart argued that the specification of the patent at issue required a claim to be construed as limited to horizontal rotation through 360°, even though the claim did not expressly recite the limitation. *Golight, Inc.*, 355 F.3d at 1330-31. Wal-Mart relied on a statement in the specification that "the present invention includes . . . rotating the lamp unit in a horizontal direction through at least 360°." *Id.* at 1331. The Federal Circuit rejected Wal-Mart's argument, finding "no clear definition or disavowal of claim scope in the written description" of the patent that would limit the claim to horizontal rotation through 360°. *Id.*

*Golight, Inc.* is inapplicable to the present case, because the issue here is not "clear definition or disavowal," but rather the degree to which the competing claim constructions stay true to the claim language and align with the inventor's description. *See Renishaw PLC*, 158 F.3d at 1250. After considering the parties' arguments and evidence, we determine that Belden's asserted construction of "a plurality of transmission media" stays true to the claim language and most naturally aligns with the inventor's description. *See id.*

Berk-Tek does not address Belden's argument that Berk-Tek's asserted claim construction is inconsistent with the claim language. PO Resp. 13. Further,

12

**A12**

Case IPR2013-00057
Patent 6,074,503

while asserting that Belden's construction unnecessarily imports limitations into the claim from the specification (Reply to PO Resp. 6-7), Berk-Tek fails to refute Belden's argument that, in "*every embodiment*" (PO Resp. 10, emphasis added; *see also id.* at 11-13), not just "a single embodiment" as Berk-Tek argues (Reply to PO Resp. 7), each of the transmission media to be cabled together is separated from all of the others. As Belden contends, every embodiment disclosed in the specification shows an individual space or channel for *each* of the transmission media that are to be cabled together. *See, e.g.,* Ex. 1002, 3:44-56; 4:57-67; Figs. 1-4.

We are not persuaded by Berk-Tek's reliance on the statement in the specification that the invention is not limited to the preferred embodiment and that the inventive principles can be applied to cables including greater or fewer numbers of twisted pairs and different core profiles than employed in that embodiment. *See* Reply to PO Resp. 7. Nothing in that statement or elsewhere in the specification suggests maintaining a spatial relationship between each of *only a subset* of the transmission media to be cabled together.

For the foregoing reasons, we construe "a plurality of transmission media" in claim 1 to encompass all of the transmission media that are enclosed in the cable under production, not merely a subset of the transmission media.

3.    "twisting motion"

Claim 1 recites the step of "passing a plurality of transmission media and a core through a first die which aligns the plurality of transmission media with surface features of the core and prevents *twisting motion* of the core" (emphasis

13

**A13**

Case IPR2013-00057
Patent 6,074,503

added).  Belden implicitly argues that the term "twisting motion," as recited in

claim 1, means "back twist."  In particular, Belden argues that:

> [A] person of ordinary skill in the art would understand claim 1's
> requirement that there be a first die that 'aligns the plurality of
> transmission media with surface features of the core and prevents
> twisting motion of the core' to mean that the first die prevents *back
> twist* from propagating beyond the die, towards the core's payoff reel.

PO Resp. 15 (citing Ex. 2003, ¶ 55 (emphasis added; bold and original italics

omitted)).  For the reasons discussed below, we disagree with Belden's implicit

construction of "twisting motion."

The plain meaning of "motion" is "an act, process, or instance of changing

place," and the plain meaning of "twisting" is "turning or changing shape under

torsion."  *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 759, 1277 (10th ed.

1993).[2]  The words "motion" and "twisting" must be given these plain meanings

unless the plain meanings are inconsistent with the specification.  *See In re Zletz*,

893 F.2d 319, 321 (Fed. Cir. 1989).

The specification of the '503 patent appears to use the words "twisting" and

"motion" in accordance with their plain meanings in stating that "a first die . . .

prevents *twisting motion* of the core."  Ex. 1002, 3:8 (emphasis added).  The word

"motion" does not appear elsewhere in the specification.  The word "twisting"

additionally appears in two places.  The specification states that "*twisting* of the

profile of the core along with the individual twisted pairs is controlled."  Ex. 1002,

4:60-62 (emphasis added).  The specification also states that "[t]he second die 411

_____

[2] The cited pages of MERRIAM WEBSTER'S COLLEGIATE DICTIONARY are included
in the record as Exhibit 3002.

Case IPR2013-00057
Patent 6,074,503

eliminates back twist, which is inherent in bunching operations, thus allowing the
third die 413 to place the pairs in the channels prior to the *twisting*." *Id.* at 5:14-17
(emphasis added).

Belden argues that, when a cabling operation imparts an overall helical twist
to the cable's components, e.g., the transmission media and the core, "that twist
can propagate back up the manufacturing line, placing tension on the cable's
components and potentially causing them to deform or break," and that
"[p]ropagation of the twist back up the manufacturing line is referred to as 'back
twist.'" PO Resp. 14 (citing Ex. 2003, ¶ 52). Belden then argues that, because the
specification teaches that die 411 in Figure 4 eliminates back twist (*see* Ex. 1002,
5:14), the person of ordinary skill would understand that "aligns the plurality of
transmission media with surface features of the core and prevents twisting motion
of the core" means "prevents back twist from propagating beyond the die, towards
the core's payoff reel." PO Resp. 15 (citing Ex. 2003, ¶ 55).

Belden's argument does not persuade us that the plain meanings of the
words "twisting" and "motion" are inconsistent with the specification.
Accordingly, we give the claim terms "twisting" and "motion" their plain
meanings. *See Zletz*, 893 F.2d at 321.

4.    "surface features"

We initially determined that the term "'surface features' is on its face broad
and does not require any particular structure, shape or configuration," and that
"[a]pplication of the broadest reasonable construction rule also results in the
conclusion that any surface feature qualifies, including the plain profile of a flat or
curved surface area." Inst. Dec. 12. Neither Berk-Tek nor Belden has raised any

15

Case IPR2013-00057
Patent 6,074,503

issue with respect to our initial construction of the term "surface features."
Accordingly, we adhere to our initial construction.

C.     Claims 1 and 2 as anticipated by the '582 patent

As noted in section I.C above, Berk-Tek contends that the '582 patent
anticipates claims 1 and 2 of the '503 patent. However, we agree with Belden that
the '582 patent does not disclose "surface features of the core which maintain a
spatial relationship *between each of the plurality of transmission media*" (emphasis
added).

1.     The '582 patent

The '582 patent is directed to a method of making an internally-shielded, or
screened, cable comprising two groups of multi-conductor pair units that are
separated from each other by a metallic strip or shield. Ex. 1003, 2:49-56. A
typical screened cable is illustrated in Figure 2 (*id.* at 4:17-18), which is
reproduced below:



Figure 2 depicts a cross-sectional end view of a screened cable

16

Case IPR2013-00057
Patent 6,074,503

Screen cable 21, which is shown in Figure 2, includes a plurality of stranded units 23−23, each of which includes "a plurality of pairs of twisted individually insulated conductors 25−25." *Id.* at 4:17-21. As illustrated in Figure 2, units 23−23 are divided into two groups, 24 and 26, which are separated by S-shaped screen 30. *Id.* at 4:25-27, 33. Group 24 carries signals in one direction, and group 26 carries signals in the other direction. *Id.* at 4:38-40. Screen 30 is a laminate comprising aluminum strip 31 with a plastic coating. *Id.* at 4:28-32. "The plastic coating on the metallic strip **31** acts as a dielectric to keep unwanted currents, which may be emitted from pinholes in the insulation of individual insulated conductors, from reaching the shield [metallic strip 31]." *Id.* at 4:41-45. The S-shaped screen includes a center portion 33 and two arcuately extending end portions or tails 34 and 36. *Id.* at 4:33-35. Units 23−23 of group 24 are enclosed between tail 34 and center portion 33, while units 23−23 of group 26 are enclosed between tail 36 and center portion 33. *Id.* at 4:35-38.

2.    Anticipation analysis

To anticipate a patent claim under 35 U.S.C. § 102, "a single prior art reference must expressly or inherently disclose each claim limitation." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008); *see also In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986) ("It is axiomatic that anticipation of a claim under § 102 can be found only if the prior art reference discloses every element of the claim.").

Belden contends that that the '582 patent discloses "separating *groups* of transmission media within the cable" and "does not teach a core with a cross-sectional profile that creates channels that *individually separate* the transmission

17

**A17**

Case IPR2013-00057
Patent 6,074,503

media from one another, as required by the plain language of the claim." PO Resp.
11. Belden points out that "many of the transmission media [in the '582 patent]
are [actually] adjacent to one another." *Id.* at 13. Belden relies on its asserted
claim construction, discussed in section II.B above, that the term "a plurality of
transmission media" in claim 1 refers to "all of the media that are closed into the
cable, not merely a subset of the media." *Id.*

Berk-Tek does not dispute Belden's assertion that the '582 patent discloses
separating *groups* of transmission media enclosed within a cable, or that the '582
patent does not disclose separating individually each of the transmission media
enclosed within the cable from one another. *See* Reply to PO Resp. 2, 6-7.
Instead, Berk-Tek relies on its asserted claim construction, discussed in section
II.B above, that "claim 1 <u>does not</u> require that every single transmission media
within the jacket needs to be individually separated by a core." *Id.* at 6. Berk-Tek
contends that "the specification and figures of the '582 [patent] teach a core that
separates a plurality of transmission media." *Id.* at 2.

As discussed above, the claim term "a plurality of transmission media" in
claim 1 encompasses all of the transmission media that are enclosed in the cable
under production, not merely a subset of the transmission media. Under that claim
construction, the limitation "surface features of the core which maintain a spatial
relationship between each of *the plurality of transmission media*" (emphasis
added) requires surface features that maintain a spatial relationship between each
of *the plural transmission media that are enclosed in the cable under production*.
Thus, as Belden contends, merely separating *two groups* of the transmission media
that are enclosed in the cable does not meet the claim requirement, because

18

**A18**

transmission media within either group may not be separated from one another. That is, irrespective of whether the plurality of transmission media in the '582 patent are considered to be the plurality of individually-insulated conductors, the plurality of pairs of twisted individually-insulated conductors, or the plurality of stranded units, many of the transmission media are adjacent to one another. As such, a spatial relationship is not maintained between each of the plurality of transmission media, as claim 1 requires.

For the foregoing reasons, we determine that the '582 patent does not anticipate claim 1 of the '503 patent. Because dependent claim 2 incorporates by reference the method of claim 1, it follows that the '582 patent does not anticipate claim 2 for the same reasons as claim 1.

D.    Claims 1 and 4 as unpatentable over JP '910

As noted in section I.C above, Berk-Tek contends that claims 1 and 4 of the '503 patent are unpatentable as obvious over JP '910. For the reasons that follow, we agree.

1.    JP '910

According to JP '910, in the conventional method of manufacturing cable, it is first necessary to produce single communication wires by jacketing them with plastic insulation by extrusion, then to strand two or four of the insulated wires into a pair or quad, and finally to bind a number of pairs or quads. Ex. 1008, ¶ 3:2-4. JP '910 teaches that such a conventional manufacturing method has certain disadvantages:

> Above all, great care must be taken when stranding 4 single communication wires into a quad in the process. That is, when the

19

**A19**

Case IPR2013-00057
Patent 6,074,503

> conductor of each single cable is not placed at each of the vertex [sic]
> of a square on the cross-section of the quad stranded wire, cross talk
> occurs by electromagnetic coupling and capacitive coupling.

*Id.* at ¶ 3:4-6.  JP '910 discloses that, before single communication wires are
stranded into a quad, it is sometimes necessary for those reasons to add a
preparatory process called "back-stranding," or to wind a securing thread or tape
around the quad-stranded wire to retain the arrangement of the quad-stranded wire.
*Id.* at ¶ 3:7-8.

The purpose of the invention of JP '910 "is to provide a method of
manufacturing plastic insulated communication cable that advantageously
eliminates the shortcomings described above."  *Id.* at ¶ 3:10-11.  Figure 1 of
JP '910 shows a side view of an embodiment and is reproduced below:

**Figure 1**



Figure 1 illustrates an assembly for carrying
out the method of forming a cable disclosed in JP '910

As illustrated in Figure 1, "an electrically insulating thread-like object 1"
(core 1) made of a material that is easily deformable by heat, such as rubber or
plastic, is extruded to heating rolls 2a, 2b, 2c, and 2d, which form corresponding

20

Case IPR2013-00057
Patent 6,074,503

longitudinal grooves 3a, 3b, 3c, and 3d thereon; the grooves are placed "so that their bottom portions align to the *vertices of a square*." *Id.* at ¶ 3:13-18; Figs. 1 & 2 (emphasis added). Then, core 1 and communication cable conductors 4a, 4b, 4c, and 4d "are guided to a wire-splitting board 5, and each of them [is] placed in a *correct location*." *Id.* at ¶ 3:19-20 (emphasis added). JP '910 further discloses:

> That is, there is a hole through which thread-like object 1 passes at the center of wire-splitting board 5, and 4 holes are placed on the board *at intervals of 90 degrees*, through which the communication cable conductors pass, *thereby* each of the 4 communication cable conductors is inserted into each of the grooves on the thread-like object 1 at the location where the communication cable conductors converge (the entrance of the left-right alternating stranding device described below).

*Id.* at ¶ 3:20-24 (emphasis added).

A person of ordinary skill would have understood from this disclosure that the four conductors are passed through the board at intervals of 90 degrees such that they are aligned with the four grooves, which are placed on core 1 at intervals of 90 degrees, and in which the conductors respectively will be inserted at the entrance of the stranding device. *See* Ex. 1012, ¶ 121. JP '910 refers to this alignment as the "correct location" and discloses that "thereby" each of the conductors is inserted into the appropriate groove at the next step in the manufacturing process. The patent claim of JP '910 is consistent with this understanding and recites "guiding the thread-like object with the grooves with 4 cable conductors 4a, 4b, 4c, and 4d to a wire-splitting board 5 thereby inserting each communication cable conductor into each groove on the thread-like object followed by stranding them alternately (left and right)." *Id.* at ¶ 2:3-5.

After wire-splitting board 5, the core and the four conductors "are stranded

21

Case IPR2013-00057
Patent 6,074,503

into SZ with a left-right alternating stranding device 8." *Id.* at ¶ 3:25-26. Finally, cable jacket 7 is formed over the cables and core 1 by extruder 6. *Id.* at ¶ 3:26; *see also* Fig. 4. Figure 4 is reproduced below:

**Figure 4**



Figure 4 shows a cross-section of the finished cable

2.    Obviousness analysis

A patent claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966). "[H]owever, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art

Case IPR2013-00057
Patent 6,074,503

would employ." *KSR*, 550 U.S. at 418; *see also In re Preda*, 401 F.2d 825, 826 (CCPA 1968) ("[I]n considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom."). The level of ordinary skill in the art usually is evidenced by the references themselves. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

Belden argues that claim 1 of the '503 patent is not unpatentable for obviousness over JP '910 because that reference does not suggest any reason, and there would have been no reason, to use the first die to prevent twisting motion of the core, as claim 1 requires. PO Resp. 24-28. It is not disputed that JP '910 discloses "passing a plurality of transmission media and a core through a first die which aligns the plurality of transmission media with surface features of the core," as recited in claim 1. *Id.* It also is not disputed that JP '910 discloses the additionally recited, bunching, twisting, and jacketing steps of claim 1. *Id.*

As discussed above, JP '910 teaches aligning, at board 5, the four grooves on core 1 with the four conductors. This requires orienting each of the grooves on core 1, as it passes through the center hole in board 5, to face in the direction of one of the four holes (placed on board 5 at intervals of 90 degrees) through which a corresponding conductor passes. A person with ordinary skill in the art would have recognized that such alignment of the grooves on core 1 with the fixed positions of the conductors on board 5 cannot be maintained if core 1 twists in relation to board 5. *See* Ex. 1012, ¶ 121.

23

**A23**

Case IPR2013-00057
Patent 6,074,503

Therefore, by teaching alignment of the grooves and the conductors at board 5, JP '910 suggests using board 5 to prevent twisting motion of core 1. That is, a person of ordinary skill in the art would have recognized that preventing twisting motion of core 1 in relation to board 5 would maintain alignment between grooves 3a, 3b, 3c, 3d and conductors 4a, 4b, 4c, 4d, in accordance with the teaching of JP '910. Further, as Berk-Tek argues, "since one of the most important concerns, as stated in the reference[,] is to avoid any misplacement of the conductors in relation to the core, it would [have been] prudent to prevent any twisting of the core relative to the conductors at the first possible instance during the manufacturing." Pet. 35-36.

That board 5 could have been used to prevent twisting of core 1 as it passes through board 5 need not be stated explicitly in JP '910. *See KSR*, 550 U.S. at 418. We are persuaded that board 5 could have been used to prevent twisting of core 1 by one with ordinary skill in the art exercising ordinary creativity. *See id.* at 421; Reply to PO Resp. 11-14; Ex. 1012, ¶¶ 118-131. For example, as explained by Berk-Tek's expert, Mr. Baxter, a person skilled in the art would have recognized that a material, such as a heat recoverable polymer that changes shape by extrusion, could have been used as a core to separate the conductors of the quad disclosed in JP '910. Ex. 1012, ¶¶ 124-126. Such a material, according to Mr. Baxter's testimony, "solidifies into a new form that would engage the die so as to prevent the back twisting motion of the core." *Id.* at ¶ 126.

Belden's first argument, which we discuss below, focuses on our Institution Decision. In our Institution Decision, we stated that Nexans [Berk-Tek's predecessor in interest] had presented logical reasoning with rational

24

**A24**

Case IPR2013-00057
Patent 6,074,503

underpinnings as to why it would have been obvious to one with ordinary skill in

the art to configure wire-splitting board 5 such that it would prevent twisting of the

core where the core passes through the board. Inst. Dec. 30. As an example, we

noted that Nexans had indicated in its petition that JP '910 states:

> Above all, great care must be taken when stranding 4 single
> communication wires into a quad in the process. That is, when the
> conductor of each single cable is not placed at each of the vertex [sic]
> of a square on the cross-section of the quad stranded wire, cross talk
> occurs by electromagnetic coupling and capacitive coupling.

*Id.* (quoting Ex. 1008, ¶ 3:4-6 and citing Pet. 35). We reasoned that:

> Given that JP '910 articulates a special need to have the wires aligned
> at precise locations on the core during stranding after passing through
> wire-splitting board 5, one with ordinary skill in the art would have
> known that the passage of core 1 through wire-splitting board 5
> preferably should be made such that twisting of the core causing
> misalignment of the wires would be prevented. One with ordinary
> skill is presumed to be skilled and would have known that twisting of
> the core at the wire-splitting board would cause misalignment of the
> wires on the core for subsequent stranding at stranding and twisting
> die 8.

*Id.* at 31.

Belden contends that the Board, in granting an *inter partes* review,

misinterpreted the statement in JP '910 quoted above. PO Resp. 25-26. More

specifically, Belden contends that the Board misinterpreted the statement as

showing that "JP '910 articulates a special need to have the wires aligned at precise

locations on the core during stranding after passing through wire-splitting board 5"

and that the Board, based on such misinterpretation, adopted Nexans's argument

that it would have been obvious to prevent the core from twisting at wire-splitting

25

Case IPR2013-00057
Patent 6,074,503

board 5. *Id.* at 25 (citing Inst. Dec. 31). Belden's position is that "[t]he passage cited by the Board does not support the idea that it would have been obvious to prevent the core from twisting at wire-splitting board 5 because JP '910 states that the cited problem was ***solved*** by his use of the thread-like object, without any mention of twisting." *Id.* at 26.

We are not persuaded by Belden's first argument. Viewed as a whole, JP '910 does teach the importance of avoiding any misplacement of the conductors in relation to the core, as Berk-Tek contends. *See* Pet. 35-36. The purpose of forming the grooves on core 1 and aligning the grooves with the conductors at board 5 is to avoid problems of misplacement, such as cross talk. *See, e.g.*, Ex. 1008, ¶ 3:4-6, 10-32.

JP '910 states that the "*purpose*" of the invention is to eliminate the shortcomings of a conventional manufacturing method. *Id.* at ¶ 3:10-11 (emphasis added). However, JP '910 does not state that the invention necessarily eliminates all potential for misplacement of the conductors, and certainly does not state that it eliminates problems due to twisting motion of *core 1*, which was not used in the conventional manufacturing method. Berk-Tek's argument that it would have been prudent, in order to avoid any misplacement of the conductors in relation to the core, to prevent any twisting of the core relative to the conductors at board 5, is not inconsistent with the teachings of JP '910 regarding problems solved. *See* Pet. 35-36.

Further, it is not disputed that JP '910 discloses "a first die which aligns the plurality of transmission media with surface features of the core," as recited in claim 1. By teaching alignment of the grooves and the conductors at board 5,

26

**A26**

Case IPR2013-00057
Patent 6,074,503

JP '910 suggests using board 5 to prevent twisting motion of core 1, as discussed
above.  In arguing that JP '910 does not provide any motivation or suggestion of a
first die that "prevents twisting motion of the core," Belden overlooks the
significance of the teaching of JP '910 with respect to alignment.  *See* PO Resp.
24-28; Ex. 1012, ¶ 121.  Moreover, an express motivation or suggestion is not
required to support a conclusion of obviousness.  *See KSR*, 550 U.S. at 418 ("[T]he
[obviousness] analysis need not seek out precise teachings directed to the specific
subject matter of the challenged claim, for a court can take account of the
inferences and creative steps that a person of ordinary skill in the art would
employ.").

Belden next argues that "there would be no reason to control twist at wire-
splitting board 5" (*id.* at 26), and raises a number of factual or technical issues in
that regard (*id.* at 26-28).

Belden argues, relying on the declaration of its expert, Mr. Clark, who is an
inventor of the patent at issue, that "[o]ne of ordinary skill in the art would
recognize that the grooves [shown in figures 2-4 of JP '910] are not deep enough to
control twisting of the thread-like object using a first die with a corresponding core
profile," particularly "because JP '910 teaches that the 'threadlike object 1 [is]
composed of a material easily deformable by heat such as rubber or plastic.'"  *Id.*
at 26-27 (citing Ex. 2003, ¶ 73).  Belden also argues that "[o]ne of ordinary skill in
the art would know that a first die as taught in the '503 Patent would not be able to
get enough grip on the thread-like object to prevent twisting during JP '910's high-
speed manufacturing operation."  *Id.* at 27 (citing Ex. 2003, ¶ 73; Ex. 1008, p. 52
(¶ 3:13-14)).  "And, if the die was constructed in a way that would prevent

27

**A27**

Case IPR2013-00057
Patent 6,074,503

backtwist, it would create forces that would deform the soft core." *Id.* (citing Ex.

2003, ¶ 73).  Belden additionally argues that:

> one of ordinary skill in the art would recognize that it would be
> desirable that the hole in wire-splitting board 5 through which the
> thread-like object passes create *no friction whatsoever*, in order to
> minimize any residual heat in the thread-like object from JP '910's
> groove cutting step before the thread-like object reaching [sic] the
> stranding operation (8).

*Id.* (citing Ex. 2003, ¶ 74).

In responding to these factual/technical issues, Berk-Tek relies on the reply

declaration of its expert, Mr. Baxter.  Reply to PO Resp. 11-14.  Berk-Tek argues

that "Clark's contention that it is not possible to prevent the twisting of the JP '910

thread-like object (core) because it is small, is speculative" and "[t]he size and

shape of the thread-like object in JP '910 has significant enough mass and

dimensions to be gripped by a die and to withstand the prevention of twisting."

Reply to PO Resp. at 13 (citing Ex. 1012, ¶¶ 126-131).  Berk-Tek also argues that

"[i]f the walls surrounding the grooves are strong enough to keep the wires within

their intended grooves during the twisting operation, then they would likewise be

strong enough to hold a grip against a die." *Id.* at 13-14 (citing Ex. 1012, ¶ 128).

Berk-Tek further argues that "Clark's proposition that the JP '910 thread-like

object (core) is too deformable because of extrusion and thus would not be able to

withstand a die that prevents its rotation is incorrect" because "[w]hen making a

cable component such as a separator, a polymer or other material would be

selected that can withstand the stresses of the cable manufacturing process." *Id.* at

14 (citing Ex. 1012, ¶¶ 123-124).

28

Case IPR2013-00057
Patent 6,074,503

Belden raises an additional factual/technical issue with respect to S-Z stranding. Belden argues that "a person of skill in the art would recognize that there would be no reason to control twisting using wire-splitting board 5, because JP '910's quad wire is S-Z stranded, meaning any tension placed on the thread-like object would be relieved when the stranding process is reversed throughout the method." PO Resp. 27-28 (citing Ex. 2003, ¶ 75).

With respect to Belden's S-Z stranding argument, Berk-Tek replies that "back-twisting of the thread-like object (core) along its own longitudinal axis . . . propagates back up the JP '910 manufacturing line as a result of S-Z strander (8)" and that, "[a]ccording to JP '910 it is extremely important for each conductor to fall in its corresponding groove, thus it would be imperative to prevent backtwisting of the thread-like object (core)." Reply to PO Resp. 13 (citing Ex. 1012, ¶¶ 117-120). "The fact that the stranding in JP '910 is S-Z instead of uni-directional helical is immaterial." *Id.* (citing Ex. 1012, ¶¶ 118-119).

As discussed above, we are persuaded by Berk-Tek and its expert, Mr. Baxter, that board 5 could have been used by one with ordinary skill in the art exercising ordinary creativity to prevent twisting of core 1 as it passes through board 5. Further, we find Mr. Baxter's testimony with respect to S-Z stranding more credible than Mr. Clark's testimony. *Compare* Ex. 1012, ¶¶ 119-120 *with* Ex. 2003, ¶ 75. For example, we credit Mr. Baxter's testimony that the relevant technical issue "is not the 'tension' on the cable components," as Mr. Clark surmises, but rather "holding the core still enough so that the conductors (4a-4d) can be placed in the grooves." Ex. 1012, ¶ 119. We additionally note that misalignment from "twisting motion" (*see* section II.B above) potentially may

29

Case IPR2013-00057
Patent 6,074,503

stem from any source and need not be caused exclusively by back twist, contrary to Belden's contentions. For the foregoing reasons, we do not agree with Belden's argument.

Accordingly, we determine that claim 1 is unpatentable as obvious over JP '910.

Berk-Tek contends that claim 4 also is unpatentable as obvious over JP '910. Claim 4 recites "[t]he method of claim 1, wherein the step of passing [a plurality of transmission media and a core through a first die] further comprises[] extruding the core so that the surface features thereof align with the plurality of transmission media." JP '910 discloses using a heating die or heating rolls 2a, 2b, 2c, and 2d, to form grooves 3a, 3b, 3c, and 3d, in core 1, so that the bottoms of the grooves "align to the vertexes of a square." *See* Ex. 1008, ¶ 3:13-18, Figs. 1-3. Petitioner argues that JP '910 "uses an extrusion/deformation process directly inline and before assembly." Pet. 43-44 (chart) (citing Ex. 1008, p. 52, ll. 4-9 [¶ 3:13-18], Figs. 1-3).

Belden does not argue the separate patentability of claim 4, but rather relies for patentability on the dependency of claim 4 from claim 1. PO Resp. 24-28.

In light of the need to insert transmission media 4a, 4b, 4c, and 4d into the grooves created by heating rolls 2a, 2b, 2c, and 2d, it would have been obvious to one with ordinary skill in the art to extrude core 1 in an in-line manner such that the grooves thereon are aligned axially and radially with the transmission media to facilitate insertion of the transmission media into the corresponding grooves. We note that one with ordinary skill in the art possesses ordinary creativity. *See KSR*,

Case IPR2013-00057
Patent 6,074,503

550 U.S. at 421.

Accordingly, we determine that claim 4 is unpatentable as obvious over JP '910.

E.    Claims 2 and 3 as unpatentable over JP '910 and
      either the '582 patent or  JP '694

Claim 2 of the '503 patent depends from claim 1 and additionally recites the step of: "before passing the transmission media and the core through the first die, passing the transmission media and the core through a third die which generally centers the core relative to the plurality of transmission media." Claim 3 of the '503 patent depends from claim 2 and additionally recites that "the step of passing the transmission media and the core th[ro]ugh the third die further comprises[] extruding the core at a center position relative to the plurality of transmission media."

As noted in section I.C above, Berk-Tek contends that claims 2 and 3 are unpatentable as obvious over JP '910 and either the '582 patent or JP '694. For the reasons that follow, we determine that claims 2 and 3 are obvious over both of the asserted combinations:  (i) JP '910 and the '582 patent; and (ii) JP '910 and JP '694.

With respect to claim 2, the specification of JP '910 does not disclose a third die placed upstream of the wire-splitting board 5, through which both the transmission media and the core pass and by which the core generally is centered relative to the plurality of transmission media. However, as Berk-Tek indicates (*see* Pet. 43), die 71 in the '582 patent and die 31 in JP '694 each suggests passing the transmission media and the core through a third die that generally centers the

31

**A31**

Case IPR2013-00057
Patent 6,074,503

core relative to the plurality of transmission media. Ex. 1003, Figs. 1, 3; Ex. 1007, Figs. 1, 2. Berk-Tek's position, as set forth in the revised petition, is that it would have been obvious to add one of those dies prior to die 5 of JP '910 "to further align the components as a matter of obvious design choice." Pet. 43. We agree.

Belden does not dispute that the '582 patent and JP '694 disclose the use of a third die as recited in claim 2; rather, Belden contends that Berk-Tek has failed to articulate an apparent reason to add the die prior to die 5 of JP '910. *See* PO Resp. 30.

Belden argues that "there is no suggestion in JP '910 of using a third die upstream of wire-splitting board 5." PO Resp. 29. Belden also argues that the petition "provides no testimony of a person of ordinary skill in the art, or any other evidence, showing why it would have been obvious to add a third die to JP '910." PO Resp. 30. First, these arguments are not persuasive, because they fail to address or rebut Berk-Tek's rationale that the third die would have been added to align further the cable components. *See* Pet 43. Second, neither JP '910 nor any other evidence needs to have provided an express suggestion of using a third die, because an express teaching, suggestion or motivation to combine is not required to support a conclusion of obviousness based on a combination of references. *See* *KSR*, 550 U.S. at 418.

Relying on Mr. Clark's declaration, Belden further argues that "a person of ordinary skill in the art would ***not*** recognize any problem in JP '910 that [] placing a third die upstream of wire-splitting board 5 would solve," and "that without an articulable reason to add a third die as recited in claim 2 of the '503 Patent, the combination of JP '910 with the '582 Patent or JP '694 is not an appropriate basis

32

**A32**

Case IPR2013-00057
Patent 6,074,503

for invalidity under § 103." PO Resp. 30-31 (citing Ex. 2003, ¶ 78; case citations omitted). Belden also argues, based on Mr. Clark's declaration, that "one of ordinary skill in the art would recognize in JP '910's manufacturing method a need to reduce drag on the threadlike object in order to minimize friction and heat that could cause the thread-like object to deform or stretch" and, "[t]herefore, a person of ordinary skill in the art would not be motivated to add a third die to JP '910, because doing so would serve only to generate additional undesirable stress caused by friction of the thread-like object against the opening of the third die, without any apparent benefit." *Id.* at 31 (citing Ex. 2003, ¶ 79).

In reply, Berk-Tek incorporates its arguments with respect to claim 1, summarized above, and argues, based on Mr. Baxter's declaration, that "using extra dies to align and alleviate stresses in a cabling arrangement is simply routine." Reply to PO Resp. 14 (citing Ex. 1012, ¶ 133-135).

We are persuaded by Berk-Tek and its expert, Mr. Baxter, that a person of ordinary skill in the art would have added a third die, as recited in claim 2, in order to align further the cable components. The issue of obviousness does not depend on whether JP '910 expressly discloses a problem that placing a third die upstream of wire-splitting board 5 would solve. *See KSR*, 550 U.S. at 418. We credit Mr. Baxter's testimony that:

> Placing a third die upstream from the wire-splitting board would solve the same problem it does in any other cable line production arrangement, namely more accurately aligning the input wires with the rest of the machine with less or lessened tensions and with better angles, allowing the supply reels to be located farther from the wire-splitting board, etc . . . .

33

Case IPR2013-00057
Patent 6,074,503

Ex. 1012, ¶ 133.  Further, we agree with Berk-Tek that the '582 patent and JP '694 each teaches the benefit of a third die.  *See* Pet. 43; Ex. 1012, ¶ 135.  We also credit Mr. Baxter's testimony that:

> [S]peculation about the inherent fragility of the thread-like object is completely unfounded based on anything in the JP '910 document. Furthermore, as you go upstream towards the supply reels, the dies get progressive[ly] looser fitting.

Ex. 1012, ¶ 134; see *also id.* ¶¶ 123-124.

> In *KSR*, the Supreme Court stated:

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

550 U.S. at 417.  The operative question is "whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.*  The Court further stated that the obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."  *KSR*, 550 U.S. at 418.

Here, inserting an additional die upstream of wire-splitting board 5 of the assembly of JP '910 involves merely a predictable use of a prior art element disclosed in each of the '582 patent and JP '694, to perform the same function it was known to perform and to yield no more than one of ordinary skill would

34

Case IPR2013-00057
Patent 6,074,503

expect from such use.

Accordingly, we determine that claim 2 is unpatentable as obvious over both of the asserted combinations: (i) JP '910 and the '582 patent; and (ii) JP '910 and JP '694.

Claim 3 recites "[t]he method of claim 2 wherein the step of passing the transmission media and the core th[ro]ugh the third die further comprises[] extruding the core at a center position relative to the plurality of transmission media." JP '910 discloses that core 1 "is extruded to a heating die or 4 heating rolls 2a, 2b, 2c, and 2d," which form grooves 3a, 3b, 3c, and 3d in core 1. *See* Ex. 1008, ¶ 3:13-18, Figs. 1-3. Thus, JP '910 discloses extruding core 1 at a center position relative to the positions (i.e., grooves 3a, 3b, 3c, and 3d) where the plurality of transmission media will be inserted. Petitioner argues that JP '910 "uses an extrusion/deformation process directly inline and before assembly." Pet. 43 (chart) (citing Ex. 1008, p. 52, ll. 4-9 [¶ 3:13-18], Figs. 1-3).

Belden does not argue the separate patentability of claim 3, but rather relies for patentability on the dependency of claim 3 from claim 2. PO Resp. 28-31.

In light of the need to place transmission media 4a, 4b, 4c, and 4d into the grooves created by heating rolls 2a, 2b, 2c, and 2d, it would have been obvious to one with ordinary skill in the art to extrude core 1 in an in-line manner such that the core is at a center position relative to the plurality of transmission media. We again note that one with ordinary skill in the art possesses ordinary creativity. *KSR*, 550 U.S. at 421.

Case IPR2013-00057
Patent 6,074,503

Accordingly, we determine that claim 3, like claim 2, is unpatentable as obvious over both of the asserted combinations: (i) JP '910 and the '582 patent; and (ii) JP '910 and JP '694.

F.    Claims 5 and 6 as unpatentable over JP '910 and CA '046

Claim 5 of the '503 patent depends from claim 1 and additionally recites: "providing as the plurality of transmission media, a plurality of twisted pairs of insulated conductors." Claim 6 of the '503 patent depends from claim 5 and additionally recites "providing as the plurality of transmission media, four twisted pairs of insulated conductors."

Berk-Tek contends that claims 5 and 6 are unpatentable as obvious over JP '910 and CA '046. However, for the reasons explained below, we agree with Belden that a person of ordinary skill in the art would *not* have had sufficient reason to apply the method of producing an insulated cable as disclosed in JP '910 to make the helically-twisted cable of CA '046 comprising twisted pairs of individually-insulated conductors. *See* PO Resp. 32-35.

1.    CA '046

CA '046 discloses an electrical telecommunications cable comprising a plurality of pairs of individually-insulated conductors, the insulated conductors in each pair being twisted together, and a spacer means such as a central core member that separates the pairs of insulated conductors from one another. Ex. 1010, 2:1-20.

36

Case IPR2013-00057
Patent 6,074,503

Figures 2 and 3 of CA '046, as reproduced at page 37 of Berk-Tek's revised petition, are reproduced below.



Figures 2 and 3 are cross-sectional views of embodiments of cables

In cable 20, illustrated in Figure 2, jacket 12 surrounds four pairs 14 of insulated conductors 16 and central core member 20 (both the cable and the central core member are labeled "20" in Figure 2).  *Id.* at 3:36-4:4.  The central core member "extends axially along the cable and is formed from a tensile dielectric material."  *Id.* at 4:4-5.  The central core member includes central core mass 22 and four tapered projections 24, with concave sides, that are angularly placed equally around the axis of the central core member and define recesses 26 between them; an individual pair of the conductors lies in each of the four recesses between the projections.  *Id.* at 4:5-14.  "The projections 24 and thus the recesses 26 extend *in helical fashion* along the core member 20 to allow the pairs 14 to lie within the recesses in stranded fashion."  *Id.* at 4:14-17 (emphasis added).

In the embodiment of Figure 3, jacket 12 of cable 30 surrounds four

37

Case IPR2013-00057
Patent 6,074,503

circumferentially spaced pairs 14 of conductors 16. *Id.* at 4:22-25. The structure is
similar to the embodiment of Figure 2 except that body 32 is "+"-shaped. *Id.*
at 4:25-31; Fig. 3. That is, "body 32 [is] formed by four *helically extending* spokes
34 which lie, in cross-section, at right angles to one another in cruciform fashion."
*Id.* at 4:28-31 (emphasis added).

    2.    Obviousness analysis

    With respect to claims 5 and 6, Belden argues that there would be no reason
for a person of ordinary skill in the art to alter the quad cable described in JP '910
to have twisted conductor pairs, with individually insulated conductors, *and* a
separator with a plus-shaped cross sectional profile. *See* PO Resp. at 33 (citing
Ex. 2003, ¶ 82). Belden further argues that "the method described in JP '910 is
intended to be an ***alternative*** to jacketing and twisting wires into a pair or quad"
and teaches away from a method of producing a cable comprising a plurality of
twisted pairs of individually-insulated conductors. *Id.* at 34 (emphasis in original).
Belden points out that "JP '910 teaches placing ***bare*** wires (4a-4d) in grooves of
[the] thread-like object, and then applying a jacket to insulate the entire structure."
*Id.* (referencing Ex. 1008, Fig. 4). Belden contends that JP '910 teaches away from
the use of individually-insulated conductors where it states:

> [I]n a "***conventional method of manufacturing plastic insulated***
> ***communication cables***, it is necessary to include a process of a cable
> core by ***producing single communication wires by jacketing them***
> ***with plastic insulator by extrusion, stranding two wires or 4 wires***
> ***into a pair or a quad, then binding a number of pairs or quads.***"

*Id.* at 33-34 (quoting Ex. 1008, ¶ 3:2-4). Belden relies on its expert and inventor,
Mr. Clark, in further arguing that "[o]ne of ordinary skill in the art would

Case IPR2013-00057
Patent 6,074,503

understand [] JP '910 to teach away from using insulated conductors; otherwise, the jacketing step would be redundant." *Id.* at 34 (citing Ex. 2003, ¶ 83). Belden also argues that one skilled in the art "would not be motivated to modify the cable shown in JP '910 to include twisted pairs, which would destroy the circular shape of JP '910's 'quad' wire." *Id.* at 34-35 (citing Ex. 2003, ¶ 83).

In turn, Berk-Tek argues that one of ordinary skill in the art would have been motivated to combine the teachings of JP '910 and CA '046 and to substitute twisted pairs for the single conductors of JP '910. Reply to PO Resp. 14. Berk-Tek contends that Belden misunderstands the scope of the claims of the '503 patent and the nature of an obviousness analysis. *Id.* at 15 (citing Ex. 1012, ¶¶ 136-141). Berk-Tek argues that dependent claims 5 and 6 are method claims that "simply substitute twisted pairs for transmission media (claim 5) or specifically four twisted pairs (claim 6)" in the method steps of claim 1. *Id.* at 15. Berk-Tek further argues that:

> [A] person skilled in the art who intended to implement a method to twist a cable that has a separator, such that at a die location the transmission media is aligned with the surface of the separator, would make sure that the die would prevent back-twisting of the separator as taught by JP'910.

*Id.* at 15 (citing Ex. 1012, ¶¶ 139-140). The implicit assumption of Berk-Tek's argument is that a skilled person would have understood the method of JP '910 as being applicable to *any twisted cable that has a separator*.

Based on Belden's opposition to the petition, including the declaration of Mr. Clark, and other evidence of record, we are persuaded that a skilled person would *not* have understood the method of JP '910 as being applicable to *any twisted cable that has a separator*, contrary to Berk-Tek's position.

39

**A39**

Case IPR2013-00057
Patent 6,074,503

JP '910 is directed to a method of producing an insulated cable comprising
the sequential steps of: (1) aligning four *bare metal conductors* with, and then
inserting them in, the corresponding grooves of an insulating core, (2) *S-Z
stranding* the core and the conductors with a left-right alternating stranding device,
and (3) *jacketing* the stranded core and conductors using an extruder. *See*
Ex. 1008, ¶ 3:13-32; Figs. 1-4. A purpose of the method is to manufacture plastic
insulated communication cable more efficiently. *See* PO Resp. 33-35; Ex. 1008,
¶ 3:2-11. In this regard, JP '910 teaches that conventional cable includes
individually-insulated conductors, and that each insulated conductor must be
jacketed individually by extrusion so as to place it in the center of a plastic
insulator. Ex. 1008, ¶ 3:3, 8-9. Further, JP '910 teaches that conventional cable
requires stranding two or four wires into a pair or a quad and then binding a
number of pairs or quads. *Id.* ¶ 3:3-4. For the purpose of eliminating these
"shortcomings" of conventional cables and the methods of making them, JP '910
teaches a method of making a new type of cable that does not include individually-
insulated conductors, much less twisted pairs of individually-insulated conductors.
*Id.* at ¶ 3:10-32; Figs. 1-4; *see also* Ex. 1012, ¶ 113 ("the '910 reference teaches a
new arrangement where only conductors are placed in their corresponding
grooves").

As such, contrary to Berk-Tek's argument, the method of making the new
cable of JP '910 cannot be understood reasonably as teaching or suggesting a
method of manufacturing all types of twisted cables having a separator. In
particular, JP '910 does *not* teach or suggest a method of making a *conventional*
twisted cable, such as a helically-twisted cable having a separator that includes

40

Case IPR2013-00057
Patent 6,074,503

twisted pairs of individually-insulated conductors. It follows, therefore, that one of ordinary skill, tasked to produce the conventional twisted cable of CA '046, would *not* have been motivated by the teachings of JP '910 simply to substitute twisted pairs of insulated conductors for the bare metal conductors in the method of JP '910, contrary to Petitioner's argument. That is, combining the teachings of JP '910 with the teachings of CA '046 would have "involve[d] more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement." *KSR*, 550 U.S. at 417.

We are persuaded that Berk-Tek has not provided an apparent reason to combine the known elements of JP '910 and CA '046. See *KSR*, 550 U.S. at 418. In particular, Berk-Tek has not explained (*see* Reply to PO Resp. 14-15) *why* a skilled person predictably would have substituted twisted pairs of individually-insulated conductors as taught by CA '046 for the bare-metal single conductors in the method of JP '910. *See KSR*, 550 U.S. at 418 ("Often, it will be necessary . . . to look to interrelated teachings of multiple patents . . . and the background knowledge possessed by a person having ordinary skill in the art, . . . in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.").

Further, even assuming that Berk-Tek's argument sufficiently articulates a reason to use the die of JP '910 to align the twisted pairs of individually-insulated conductors and the separator of CA '046 and to prevent twisting of the separator, Berk-Tek has not explained why a person of ordinary skill in the art would have had sufficient reason to use the S-Z stranding step of JP '910 to manufacture the

41

Case IPR2013-00057
Patent 6,074,503

helically-twisted cable of CA '046. It is undisputed that the left-right S-Z
stranding device of JP '910 twists the cable components "periodically in one
direction and then in the other direction," which is different from "a uni-directional
stranding operation." Ex. 1012, ¶ 120. It also is undisputed that CA '046 discloses
"a helically twisted cable." *See* Pet. 37; Ex. 1012, ¶ 138. As such, the S-Z
stranding step of JP '910 is inconsistent with production of a helically-twisted
cable, such as disclosed in CA '046.

Berk-Tek also has not explained why a person of ordinary skill in the art
would have had sufficient reason to use the final jacketing/extrusion step of
JP '910, which serves to insulate electrically the bare-metal conductors of JP '910,
to manufacture a cable comprising twisted pairs of individually-insulated
conductors that do not require additional electrical insulation. In this regard, Berk-
Tek has not replied to Belden's argument that "the jacketing step [of JP '910]
would be redundant," if insulated conductors were substituted for the bare-metal
conductors in the method of JP '910. *See* PO Resp. 34 (citing Ex. 2003, ¶ 83).
Nor has Berk-Tek responded to Belden's argument that modifying the cable of
JP '910 to include twisted pairs would "destroy the circular shape of JP '910's
'quad' wire." *Id.* at 34-35 (citing Ex. 2003, ¶ 83). On the present record, Belden's
arguments are unopposed.

For the foregoing reasons, we determine that claim 5 of the '503 patent is
not unpatentable as obvious over JP '910 and CA '046. Because dependent
claim 6 incorporates by reference the method of claim 5, it follows that claim 6 in
not unpatentable as obvious over JP '910 and CA '046 for the same reasons as
claim 5.

42

**A42**

Case IPR2013-00057
Patent 6,074,503

G.    Belden's motion to exclude.

Belden filed a motion (Paper 36, "Mot. Excl.") seeking to exclude the declaration of Berk-Tek's expert, Mr. Baxter (Ex. 1012), the appendices to Mr. Baxter's declaration ("Exs. 1012A-1012S"), and Mr. Baxter's curriculum vitae ("CV") (Ex. 1013).  Mot. Excl. 1.  In addition to raising evidentiary issues, Belden's motion seeks to exclude Berk-Tek's reply evidence for "belatedly identifying new arguments and evidence necessary to establish its *prima facie* case for unpatentability."  *Id.* at 2.

Prior to filing its motion to exclude, Belden initiated a telephone conference to object to Berk-Tek's reply and supporting evidence.  During the telephone conference, the Board explained that it did not need special briefing on whether Berk-Tek's reply is improper for including information it should have submitted in its petition, and that the Board would consider the matter when rendering its final written decision.  The Board issued an Order (Paper 29) authorizing Berk-Tek to file a revised reply that "relies on less of the reply declaration currently of record."  The Board did not require Berk-Tek to excise any portions of the reply declaration on which it chose not to rely in its revised reply.  Pursuant to the Board's Order, Berk-Tek filed a revised reply (Paper 30) along with a supplemental declaration of Mr. Baxter (Paper 31).

After Belden filed its motion to exclude, Berk-Tek initiated a telephone conference to object to Belden's motion.  During the telephone conference, the Board explained that Belden should have sought prior authorization before providing briefing on whether Berk-Tek's revised reply or supporting evidence

43

**A43**

Case IPR2013-00057
Patent 6,074,503

exceeded its appropriate scope. However, noting that Berk-Tek had indicated in the telephone conference a readiness to respond to Belden's briefing in an opposition to the motion, the Board, nevertheless, issued an Order (Paper 39) retroactively authorizing Belden to include in its motion to exclude a discussion of why Berk-Tek's revised reply to Belden's patent owner response is improper for including arguments and evidence that should have been presented in Berk-Tek's initial petition.

Berk-Tek filed a response (Paper 40, "Resp. Mot. Excl.") to the motion to exclude. Belden then filed a reply (Paper 44, "Reply Mot. Excl") in support of its motion.

Upon consideration of the parties' arguments, we deny Belden's motion to exclude. We provide our reasons below.

First, Belden seeks to exclude the entirety of Mr. Baxter's declaration, all of its appendices, and Mr. Baxter's CV on the ground that, in paragraphs 37-47 of his declaration, Mr. Baxter offers various opinions about the '503 prosecution history that are not responsive to anything contained in the declaration of Belden's expert, Mr. Clark. Mot. Excl. (Paper 36) 3-4. However, Belden admits that Berk-Tek's revised reply does not cite to these paragraphs. *Id.* at 3. As such, Berk-Tek does not rely on the challenged paragraphs, and we have not considered them in reaching our final decision. Therefore, we consider the issue to be moot.

Second, Belden seeks to exclude the entirety of Mr. Baxter's declaration, all of its appendices, and Mr. Baxter's CV on the ground that "Mr. Baxter's assertion" —in paragraph 63 of his declaration relating to asserted anticipation of claims 1 and 2 by the '582 patent—"that claim 1 of the '503 Patent does not require

44

**A44**

Case IPR2013-00057
Patent 6,074,503

separation of all the cable's transmission media represents a newly articulated

claim construction position that should have been in the Petition." *Id.* at 5; *see also*

*id.* at 4 (citing Ex. 1012 ¶ 63).  Belden's argument is moot and need not be

reached, because even without excluding Mr. Baxter's declaration, we have

determined that the '582 patent does not anticipate claims 1 and 2 of the '503

patent.

Third, Belden seeks to exclude the entirety of Mr. Baxter's declaration, all of

its appendices, and Mr. Baxter's CV on the ground that, in paragraph 138 of his

declaration (not identified by paragraph number in Belden's motion), Mr. Baxter

belatedly presents evidence in support of the unpatentability of claims 5 and 6 over

JP '910 and CA '046.  *Id.* at 6.  However, Belden's expert, Mr. Clark, testified, in

paragraphs 82 and 83 of his declaration (Ex. 2003), that a person of ordinary skill

would not have been motivated to combine the teachings of JP '910 and CA '046.

We determine that the cited testimony of Mr. Baxter fairly responds to Mr. Clark's

declaration.

Fourth, Belden seeks to exclude Mr. Baxter's declaration and his CV on the

general ground that "[i]t is improper for [Berk-Tek] to attempt to establish its

prima facie case through its reply declaration." Mot. Excl. 7.  Belden similarly

seeks to exclude all of the appendices to Mr. Baxter's declaration and Mr. Baxter's

CV on the general ground that Berk-Tek relies on them to support new arguments

that should have been identified in Berk-Tek's revised petition.  *Id.* at 7-15.

Belden raises a similar issue with respect to Exhibit 1012F specifically; in

particular, Belden argues that Berk-Tek relies on Exhibit 1012F to support new

arguments relating to the '582 patent that should have been identified in Berk-

Case IPR2013-00057
Patent 6,074,503

Tek's petition. *Id.* at 9. Belden has not persuaded us that Mr. Baxter's testimony was necessary for Berk-Tek to establish a prima facie case. Further, we are satisfied that Mr. Baxter's declaration, including the appendices and his CV, generally are in fair reply to Mr. Clark's declaration and/or Belden's response to the revised petition. *See, e.g.*, our discussion of the parties' competing positions relating to JP '910 in section II.D *supra*. Belden's argument with respect to Exhibit 1012F is moot and need not be reached because, even without excluding Exhibit 1012F, we have determined that the '582 patent does not anticipate claims 1 and 2 of the '503 patent.

Belden next argues that Berk-Tek's revised reply improperly relies on Exhibits 1012A-1012S and Mr. Baxter's CV. *Id.* at 7.

Belden has not identified where Berk-Tek's revised reply cites or relies on Exhibits 1012C-1012E, Exhibits 1012H-1012S, or Mr. Baxter's CV. Accordingly, Belden has not persuaded us that Berk-Tek has improperly relied on those exhibits. *See* Reply Mot. Excl. 1 (stating that Berk-Tek did not rely on those particular exhibits in its revised reply).

Exhibits 1012A and 1012B are transcripts of Mr. Clark's testimony under oath at a deposition and a trial, respectively. The exhibits are admissible under Fed. R. Evid. 801(d)(2)(C), 806.

Exhibit 1012F and 1012G are U.S. patents and admissible. *See* 37 C.F.R. § 42.61(b).

For the foregoing reasons, Belden's motion to exclude is denied.

46

Case IPR2013-00057
Patent 6,074,503

## CONCLUSION

Berk-Tek has shown, by a preponderance of the evidence, that: (1) claims 1 and 4 of the '503 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over JP '910; and (2) claims 2 and 3 of the '503 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over (i) JP '910 and the '582 patent and (ii) JP '910 and JP '694.

Berk-Tek has not shown, by a preponderance of the evidence, that claims 1 and 2 of the '503 patent are unpatentable under 35 U.S.C. § 102 as anticipated by the '582 patent or that claims 5 and 6 of the '503 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over JP '910 and CA '046.

## ORDER

In consideration of the foregoing, it is

ORDERED that claims 1, 2, 3, and 4 of the '503 patent are unpatentable;

FURTHER ORDERED that claims 5 and 6 of the '503 patent have not been shown to be unpatentable; and

FURTHER ORDERED that Belden's motion to exclude is DENIED.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Case IPR2013-00057
Patent 6,074,503

For PETITIONER

Joseph Sofer
SOFER & HAROUN L.L.P
joesofer@soferharoun.com

David Soofian
James Blank
KAYE SCHOLER LLP
david.soofian@kayescholer.com
james.blank@kayescholer.com

For PATENT OWNER

Matthew B. Lowrie
Aaron W. Moore
FOLEY & LARDNER LLP
mlowrie-PTAB@foley.com
amoore-PTAB@foley.com

48



US006074503A

## United States Patent [19]

### Clark et al.

[11] **Patent Number:** 6,074,503

[45] **Date of Patent:** Jun. 13, 2000

[54] **MAKING ENHANCED DATA CABLE WITH CROSS-TWIST CABLED CORE PROFILE**

[75] Inventors: **William T. Clark**, Lancaster; **Peter D. MacDonald**, Gardner; **Joseph Dellagala**, Shrewsbury, all of Mass.

[73] Assignee: **Cable Design Technologies, Inc.,** Leominster, Mass.

[21] Appl. No.: **08/841,440**

[22] Filed: **Apr. 22, 1997**

[51] **Int. Cl.**$^7$ ................................................... **H01B 13/00**

[52] **U.S. Cl.** ................................. **156/50**; 156/47; 156/55; 174/131 A

[58] **Field of Search** ..................................... 156/47, 50, 55, 156/52, 244.15; 174/70 C, 34, 36, 99 R, 116, 113 A, 131 R, 131 A; 385/105, 107, 110, 112; 264/1.28; 57/6, 12, 13

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 483,285 | 9/1892 | Guilleaume | 174/113 C |
| 1,132,452 | 3/1915 | Davis | 174/116 |
| 1,700,606 | 1/1929 | Beaver | 174/116 |
| 1,977,209 | 10/1934 | Sargent | 174/131 A |
| 1,995,201 | 3/1935 | Delon | 156/55 |
| 2,501,457 | 3/1950 | Thelin | 174/116 |
| 2,882,676 | 4/1959 | Bryan et al. | 57/138 |
| 3,340,112 | 9/1967 | Davis et al. | 156/47 |

| | | | |
|---|---|---|---|
| 3,559,390 | 2/1971 | Staschewski | 156/47 |
| 3,603,715 | 9/1971 | Eilhardt et al. | 174/15 |
| 3,644,659 | 2/1972 | Campbell | 174/27 |
| 3,819,443 | 6/1974 | Simons et al. | 156/204 |
| 4,778,246 | 10/1988 | Carroll | 385/107 |
| 5,149,915 | 9/1992 | Brunker et al. | 174/36 |
| 5,418,878 | 5/1995 | Sass et al. | 385/101 |
| 5,544,270 | 8/1996 | Clark et al. | 385/101 |
| 5,574,250 | 11/1996 | Hardie et al. | 174/36 |
| 5,789,711 | 8/1998 | Gaeris et al. | 174/131 A |

#### FOREIGN PATENT DOCUMENTS

43 36 230 C1   3/1995   Germany .

#### OTHER PUBLICATIONS

images of Belden 1711A Datatwist 300 4PR23 shielded cable, Sep. 11, 1995.

*Primary Examiner*—Geoffrey L. Knable
*Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

[57] **ABSTRACT**

A cable exhibiting reduced crosstalk between transmission media includes a core having a profile with a shape which defines spaces or channels to maintain a spacing between transmission media in a finished cable. The core is formed of a conductive material to further reduce crosstalk. A method of producing a cable introduces a core as described above into the cable assembly and imparts a cable closing twist to the assembly.

**4 Claims, 2 Drawing Sheets**





Fig. 1



Fig. 2



Fig. 3



Fig. 4

6,074,503

1

## MAKING ENHANCED DATA CABLE WITH CROSS-TWIST CABLED CORE PROFILE

### BACKGROUND

1. Field of the Invention

The present invention relates to high-speed data communications cables using at least two twisted pairs of wires. More particularly, it relates to cables having a central core defining plural individual pair channels.

2. Related Art

High-speed data communications media in current usage include pairs of wire twisted together to form a balanced transmission line. Such pairs of wire are referred to as twisted pairs.

One common type of conventional cable for high-speed data communications includes multiple twisted pairs. When twisted pairs are closely placed, such as in a cable, electrical energy may be transferred from one pair of a cable to another. Such energy transferred between pairs is undesirable and referred to as crosstalk. The Telecommunications Industry Association and Electronics Industry Association have defined standards for crosstalk, including TIA/EIA-568A. The International Electrotechnical Commission has also defined standards for data communication cable crosstalk, including ISO/IEC 11801. One high-performance standard for 100Ω cable is ISO/IEC 11801, Category 5.

In conventional cable, each twisted pair of a cable has a specified distance between twists along the longitudinal direction, that distance being referred to as the pair lay. When adjacent twisted pairs have the same pair lay and/or twist direction, they tend to lie within a cable more closely spaced than when they have different pair lays and/or twist direction. Such close spacing increases the amount of undesirable crosstalk which occurs. Therefore, in some conventional cables, each twisted pair within the cable has a unique pair lay in order to increase the spacing between pairs and thereby to reduce the crosstalk between twisted pairs of a cable. Twist direction may also be varied. Along with varying pair lays and twist directions, individual solid metal or woven metal pair shields are sometimes used to electromagnetically isolate pairs.

Shielded cable, although exhibiting better crosstalk isolation, is more difficult and time consuming to install and terminate. Shield conductors are generally terminated using special tools, devices and techniques adapted for the job.

One popular cable type meeting the above specifications is Unshielded Twisted Pair (UTP) cable. Because it does not include shield conductors, UTP is preferred by installers and plant managers, as it is easily installed and terminated. However, UTP fails to achieve superior crosstalk isolation, as required by state of the art transmission systems, even when varying pair lays are used.

Another solution to the problem of twisted pairs lying too closely together within a cable is embodied in a cable manufactured by Belden Wire & Cable Company as product number 1711 A. This cable includes four twisted pair media radially disposed about a "+"-shaped core. Each twisted pair nests between two fins of the "+"-shaped core, being separated from adjacent twisted pairs by the core. This helps reduce and stabilize crosstalk between the twisted pair media. However, the core adds substantial cost to the cable, as well as material which forms a potential fire hazard, as explained below, while achieving a crosstalk reduction of only about 5dB.

In building design, many precautions are taken to resist the spread of flame and the generation of and spread of

2

smoke throughout a building in case of an outbreak of fire. Clearly, it is desired to protect against loss of life and also to minimize the costs of a fire due to the destruction of electrical and other equipment. Therefore, wires and cables for in building installations are required to comply with the various flammability requirements of the National Electrical Code (NEC) and/or the Canadian Electrical Code (CEC).

Cables intended for installation in the air handling spaces (ie. plenums, ducts, etc.) of buildings are specifically required by NEC or CEC to pass the flame test specified by Underwriters Laboratories Inc. (UL), UL-910, or it's Canadian Standards Association (CSA) equivalent, the FT6. The UL-910 and the FT6 represent the top of the fire rating hierarchy established by the NEC and CEC respectively. Cables possessing this rating, generically known as "plenum" or "plenum rated", may be substituted for cables having a lower rating (ie. CMR, CM, CMX, FT4, FT1 or their equivalents), while lower rated cables may not be used where plenum rated cable is required.

Cables conforming to NEC or CEC requirements are characterized as possessing superior resistance to ignitability, greater resistant to contribute to flame spread and generate lower levels of smoke during fires than cables having a lower fire rating. Conventional designs of data grade telecommunications cables for installation in plenum chambers have a low smoke generating jacket material, e.g. of a PVC formulation or a fluoropolymer material, surrounding a core of twisted conductor pairs, each conductor individually insulated with a fluorinated ethylene propylene (FEP) insulation layer. Cable produced as described above satisfies recognized plenum test requirements such as the "peak smoke" and "average smoke" requirements of the Underwriters Laboratories, Inc., UL910 Steiner test and/or Canadian Standards Association CSA-FT6 (Plenum Flame Test) while also achieving desired electrical performance in accordance with EIA/TIA-568A for high frequency signal transmission.

While the above-described conventional cable including the Belden 1711 A cable due in part to their use of FEP meets all of the above design criteria, the use of fluorinated ethylene propylene is extremely expensive and may account for up to 60% of the cost of a cable designed for plenum usage.

The solid core of the Belden 1711 A cable contributes a large volume of fuel to a cable fire. Forming the core of a fire resistant material, such as FEP, is very costly due to the volume of material used in the core.

Solid flame retardant/smoke suppressed polyolefin may also be used in connection with FEP. Solid flame retardant/ smoke suppressed polyolefin compounds commercially available all possess dielectric properties inferior to that of FEP. In addition, they also exhibit inferior resistance to burning and generally produce more smoke than FEP under burning conditions than FEP.

### SUMMARY OF THE INVENTION

This invention provides an improved data cable.

According to one embodiment, the cable includes a plurality of transmission media; a core having a surface defining recesses within which each of the plurality of transmission media are individually disposed; and an outer jacket maintaining the plurality of data transmission media in position with respect to the core.

According to another embodiment of the invention, a cable includes a plurality of transmission media radially disposed about a core having a surface with features which

6,074,503

3

maintain a separation between each of the plurality of transmission media.

Finally, according to yet another embodiment of the invention, there is a method of producing a cable. The method first passes a plurality of transmission media and a core through a first die which aligns the plurality of transmission media with surface features of the core and prevents twisting motion of the core. Next, the method bunches the aligned plurality of transmission media and core using a second die which forces each of the plurality of transmission media into contact with the surface features of the core which maintain a spatial relationship between each of the plurality of transmission media and core are twisted to close the cable, and the closed cable is jacketed.

#### BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, in which like reference numerals designate like elements:

FIG. 1 is a cross-sectional view of a cable core used in embodiments of the invention;

FIG. 2 is a cross-sectional view of one embodiment of a cable including the core of FIG. 1;

FIG. 3 is a cross-sectional view of another embodiment of a cable including the core of FIG. 1; and

FIG. 4 is a perspective view of a die system for practicing a method of making a cable in accordance with another embodiment of the invention.

#### DETAILED DESCRIPTION

An embodiment of the invention is now described in which a cable is constructed to include four twisted pairs of wire and a core having a unique profile. However, the invention is not limited to the number of pairs or the profile used in this embodiment. The inventive principles can be applied to cables including greater or fewer numbers of twisted pairs and different core profiles. Also, although this embodiment of the invention is described and illustrated in connection with twisted pair data communication media, other high-speed data communication media can be used in constructions of cable according to the invention.

This illustrative embodiment of the invention, as shown in FIG. 1, includes an extruded core 101 having a profile described below cabled into the cable with four twisted pairs 103. The extruded core profile has an initial shape of a "+", providing four spaces or channels 105 between each pair of fins of the core. Each channel 105 carries one twisted pair 103 placed within the channel 105 during the cabling operation. The illustrated core 101 and profile should not be considered limiting. The core 101 may be made by some other process than extrusion and may have a different initial shape or number of channels 105. For example, there may be an optional central channel 107 provided to carry a fiber optic element.

The above-described embodiment can be constructed using a number of different materials. While the invention is not limited to the materials now given, the invention is advantageously practiced using these materials. The core material should be a conductive material or one containing a powdered ferrite, the core material being generally compatible with use in data communications cable applications, including any applicable fire safety standards. In non-plenum applications, the core can be formed of solid or foamed flame retardant polyolefin or similar materials. In plenum applications, the core can be any one or more of the

4

following compounds: a solid low dielectric constant fluoropolymer, e.g., ethylene chlortrifluoroethylene (E-CTFE) or fluorinated ethylene propylene (FEP), a foamed fluoropolymer, e.g., foamed FEP, and polyvinyl chloride (PVC) in either solid, low dielectric constant form or foamed. A filler is added to the compound to render the extruded product conductive. Suitable fillers are those compatible with the compound into which they are mixed, including but not limited to powdered ferrite, semiconductive thermoplastic elastomers and carbon black. Conductivity of the core helps to further isolate the twisted pairs from each other.

A conventional four-pair cable including a non-conductive core, such as the Belden 1711 A cable, reduces nominal crosstalk by up to 5dB over similar, four-pair cable without the core. By making the core conductive, crosstalk is reduced a further 5dB. Since both loading and jacket construction can affect crosstalk, these figures compare cables with similar loading and jacket construction.

The cable may be finished in any one of several conventional ways, as shown in FIG. 2. The combined core 101 and twisted pairs 103 may be optionally wrapped with a dielectric tape 201, then jacketed 205 to form cable 200. An overall conductive shield 205 can optionally be applied over the cable before jacketing to prevent the cable from causing or receiving electromagnetic interference. The jacket 203 may be PVC or another material as discussed above in relation to the core 101. The dielectric tape 201 may be polyester, or another compound generally compatible with data communications cable applications, including any applicable fire safety standards.

Greater crosstalk isolation is achieved in the construction of FIG. 3, by using a conductive shield 301, for example a metal braid, a solid metal foil shield or a conductive plastic layer in contact with the ends of the fins 303 of the core 101. Such a construction rivals individual shielding of twisted pairs for crosstalk isolation. This construction optionally can advantageously include a drain wire in a central channel 107. In the constructions of both FIGS. 2 and 3 it is advantageous to have the fins 303 of the core 101 extend somewhat beyond a boundary defined by the outer dimension of the twisted pairs 103. In the construction of FIG. 2 this ensures that he twisted pairs 103 do not escape their respective channels 105 prior to the cable being jacketed, while in that of FIG. 3 and good contact between the fins 303 and the shield 301 is ensured. In both constructions, closing and jacketing the cable may bend the tips of the fins 303 over slightly, as shown in the core material is relatively soft, such as PVC.

A method of making cable in accordance with the above-described embodiments is now described.

As is known in this art, when plural elements are cabled together, an overall twist is imparted to the assembly to improve geometric stability and help prevent separation. In embodiments of the present invention, twisting of the profile of the core along with the individual twisted pairs is controlled. The process allows the extruded core to maintain a physical spacing between the twisted pairs and maintains geometrical stability within the cable. Thus, the process assists in the achievement of and maintenance of high crosstalk isolation by placing a conductive core in the cable to maintain pair spacing.

6,074,503

5

Cables of the previously described embodiments, can be made by a three-part die system. However, methods of making such cables are not limited to a three-part die system, as more or fewer die elements can be constructed to incorporate the features of the invention.

The extruded core is drawn from a payoff reel (not shown) through the central opening **401** in die **403**. Four twisted pairs are initially aligned with the core by passing through openings **405** in die **403**. The core is next brought through opening **407** and brought together with the four twisted pairs which are passed through openings **409** in a second die **411**, then cabled with the twisted pairs which are pushed into the channels of the core by a third die **413**, in an operation called bunching. The second die **411** eliminates back twist, which is inherent in bunching operations, thus allowing the third die **413** to place the pairs in the channels prior to the twisting. The cable twist is imparted to the cable assembly after the second die **411**, which locates the twisted pairs relative to the extruded core profile.

Although the method of making cable has been described in connection with an extruded core delivered into the process from a payoff reel, the invention is not so limited. For example, the core could be extruded immediately prior to use and transferred directly from the extruder to the central opening **401** of the first die **403**. In another variation, the core could be extruded directly through a properly shaped central opening of either the first die **403** or the second die **411**.

The present invention has now been described in connection with a number of specific embodiments thereof. However, numerous modifications which are contemplated as falling within the scope of the present invention should now be apparent to those skilled in the art. Therefore, it is

6

intended that the scope of the present invention be limited only by the scope of the claims appended hereto.

What is claimed is:

1. A method of producing a cable, comprising steps of:
   passing a plurality of transmission media and a core through a first die which aligns the plurality of transmission media with surface features of the core and prevents twisting motion of the core;
   bunching the aligned plurality of transmission media and core using a second die which forces each of the plurality of transmission media into contact with the surface features of the core which maintain a spatial relationship between each of the plurality of transmission media;
   twisting the bunched plurality of transmission media and core to close the cable; and
   jacketing the closed cable.

2. The method of claim **1**, further comprising the steps of:
   before passing the transmission media and the core through the first die, passing the transmission media and the core through a third die which generally centers the core relative to the plurality of transmission media.

3. The method of claim **2** wherein the step of passing the transmission media and the core thorugh the third die further comprises:
   extruding the core at a center position relative to the plurality of transmission media.

4. The method of claim **1**, wherein the step of passing further comprises:
   extruding the core so that the surface features thereof align with the plurality of transmission media.

\* \* \* \* \*



US006074503C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (7790th)

# United States Patent
## Clark et al.

(10) **Number:** US 6,074,503 C1
(45) **Certificate Issued:** Oct. 5, 2010

(54) **MAKING ENHANCED DATA CABLE WITH CROSS-TWIST CABLED CORE PROFILE**

(75) Inventors: **William T. Clark**, Lancaster, MA (US); **Peter D. MacDonald**, Gardner, MA (US); **Joseph Dellagala**, Shrewsbury, MA (US)

(73) Assignee: **Belden Technologies, Inc.**, St. Louis, MO (US)

**Reexamination Request:**
No. 90/009,466, Jul. 9, 2009

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **6,074,503** |
| Issued: | **Jun. 13, 2000** |
| Appl. No.: | **08/841,440** |
| Filed: | **Apr. 22, 1997** |

(51) **Int. Cl.**
*H01B 11/02* (2006.01)
*H01B 11/08* (2006.01)

(52) **U.S. Cl.** ............................ 156/50; 156/55; 156/47; 174/131 A

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,792,442 | A | 5/1957 | Parce |
| 3,055,967 | A | 9/1962 | Bondon |
| 3,622,683 | A | 11/1971 | Roberts et al. |
| 3,715,877 | A | 2/1973 | Akachi |
| 3,911,200 | A | 10/1975 | Simons et al. |
| 3,921,378 | A | 11/1975 | Spicer et al. |
| 4,205,899 | A | 6/1980 | King et al. |
| 4,257,675 | A | 3/1981 | Nakagome et al. |
| 4,319,940 | A | 3/1982 | Arroyo et al. |
| 4,385,485 | A | 5/1983 | Yonechi |
| 4,393,582 | A | 7/1983 | Arnold, Jr. et al. |
| 4,411,130 | A | 10/1983 | Dubois et al. |
| 4,428,787 | A | 1/1984 | Pan et al. |
| 4,459,799 | A | 7/1984 | Beucher |

| | | | |
|---|---|---|---|
| 4,600,268 | A | 7/1986 | Spicer |
| 4,644,098 | A | 2/1987 | Norris et al. |
| 4,645,628 | A | 2/1987 | Gill |
| 4,697,051 | A | 9/1987 | Beggs et al. |
| 4,712,368 | A | 12/1987 | Garner |
| 4,755,629 | A | 7/1988 | Beggs et al. |
| 4,784,461 | A | 11/1988 | Abe et al. |
| 4,784,462 | A | 11/1988 | Priaroggia |
| 5,087,110 | A | 2/1992 | Inagaki et al. |
| 5,115,485 | A | 5/1992 | Gandy |
| 5,424,491 | A | 6/1995 | Walling et al. |
| 5,767,441 | A | 6/1998 | Brorein et al. |
| 5,969,295 | A | 10/1999 | Boucino et al. |
| 6,255,593 | B1 | 7/2001 | Reede |
| 6,570,095 | B2 | 5/2003 | Clark et al. |
| 6,998,537 | B2 | 2/2006 | Clark et al. |
| 7,179,999 | B2 | 4/2007 | Clark et al. |
| 7,339,116 | B2 | 3/2008 | Gareis et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2058046 | 8/1992 |

(Continued)

OTHER PUBLICATIONS

Trent M. Hays, presentation entitled, "Evaluation of Alien Crosstalk in Cat 5e and Cat 6 Installations" IEEE 802.3 10GBASE–T Study Group, Mar. 2003.
Chris DiMinico, "Lower cost copper solutions may drive 1–Gigabit Ethernet," Aug. 1, 2003.
Excerpts from Belden Inc., Form 10–K, for the fiscal year ended Dec. 31, 2008.
Merriam–Webster Online Dictionary.
Comprehensive Dictionary of Electrical Engineering 188 (2nd ed. 2005).
Electronics Engineers' Handbook 1.3.1.

*Primary Examiner*—Stephen J Stein

(57) **ABSTRACT**

A cable exhibiting reduced crosstalk between transmission media includes a core having a profile with a shape which defines spaces or channels to maintain a spacing between transmission media in a finished cable. The core is formed of a conductive material to further reduce crosstalk. A method of producing a cable introduces a core as described above into the cable assembly and imparts a cable closing twist to the assembly.



**US 6,074,503 C1**

Page 2

| FOREIGN PATENT DOCUMENTS | | |
|---|---|---|
| DE | 697378 | 10/1940 |
| DE | 24 59 844 | 7/1946 |
| DE | 9011484 | 11/1990 |
| EP | 0961296 | 1/1999 |
| EP | 1059343 | 12/2000 |
| EP | 1085530 | 3/2001 |
| EP | 1162632 | 12/2001 |
| FR | 694100 | 11/1930 |
| FR | 1265877 | 5/1961 |
| FR | 2706068 | 12/1994 |
| FR | 2751779 | 1/1998 |
| GB | 725624 | 3/1955 |
| JP | SHO56-7307 | 1/1981 |
| JP | 5719910 | 2/1982 |
| JP | SHO57-19910 | 2/1982 |
| JP | 4332406 | 11/1992 |
| JP | HEI8-96635 | 4/1996 |
| WO | 9848430 | 10/1998 |
| WO | 0051142 | 8/2000 |
| WO | 2005041219 | 5/2005 |

US 6,074,503 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

**2**

The patentability of claims **1-4** is confirmed.

New claims **5** and **6** are added and determined to be patentable.

*5. The method of claim 1, further comprising:*

*providing as the plurality of transmission media, a plurality of twisted pairs of insulated conductors.*

*6. The method of claim 5, further comprising:*

*providing as the plurality of transmission media, four twisted pairs of insulated conductors.*

\* \* \* \* \*

# United States Court of Appeals
# for the Federal Circuit

*Belden Inc. v. Berk-Tek LLC,* 14-1575, -1576

## CERTIFICATE OF SERVICE

I, John C. Kruesi, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by FOLEY & LARDNER LLP, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **September 25, 2014,** counsel has authorized me to electronically file the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

James S. Blank
*(Principal Counsel)*
David Soofian
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
212-836-7528
james.blank@kayescholer.com
David.Soofian@kayescholer.com
*Counsel for Cross-Appellant*

Gregory Charles Antrim
Joseph Sofer
Sofer & Haroun, L.L.P.
317 Madison Avenue, Suite 910
New York, NY 10017
212-697-2800
gregantrim@soferharoun.com
joesofer@soferharoun.com
*Counsel for Cross-Appellant*

Frances M. Lynch
*(Principal Counsel)*
Nathan K. Kelley
Robert J. McManus
U.S. Patent & Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313-1450
frances.lynch@uspto.gov
robert.mcmanus@uspto.gov
nathan.kelley@uspto.gov
*Attorneys for PTO*

Copies will also be emailed to the above counsel on this date and paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

September 25, 2014                                   /s/ John C. Kruesi, Jr.
                                                    Counsel Press

## <u>CERTIFICATE OF COMPLIANCE</u>

Appellant Belden's brief is submitted in accordance with Federal Rule of Appellate Procedure 32(a)(7)(B)(i). As to the items identified in Federal Rule of Appellate Procedure 32(a)(b)(B)(iii), the brief contains 13,837 words, as determined by Microsoft Word.

This brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: September 25, 2014                    Respectfully submitted,

/s/ Matthew A. Ambros
Matthew B. Lowrie
Aaron W. Moore
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
P: (617) 342-4000
F: (617) 342-4001

*Attorneys for Appellant Belden Inc.*